## WISCONSIN *v.* HITCHCOCK.

### IN EQUITY.

No. 12, Original.    Argued February 21, 1906.—Decided April 2, 1906.

The provisions in the enabling act of August 6, 1846, authorizing the people of the then Territory of Wisconsin to form a state government, and by which section 16 in every township of the public lands, in that Territory, not sold or otherwise disposed of was granted to the State for the use of schools, did not operate to vest in the State section 16 of townships within the La Pointe or Bad River and the Flambeau Indian Reservations from which the Indians have never been required to remove; and this notwithstanding by the provisions in treaties executed prior to 1846 the Indians occupying them ceded those lands to the United States only retaining the privileges of occupancy thereof until required to remove therefrom by the President of the United States, and that after 1846 the same lands were included in the reservations as they now exist. *United States* v. *Thomas,* 151 U. S. 557, followed, as determinative of this case (although it did not have reference to the particular Reservation involved in this case). It was held that the court will not, at this time and at the instance of the State, interfere with the administration by the Interior Department of the lands in question for the benefit of the Indians for whom the Reservation was established.

THE State of Wisconsin seeks by this suit to enjoin the defendant as Secretary of the Interior from interfering, in anywise, with its use, possession or enjoyment of certain lands, embraced within the present La Pointe or Bad River and the Flambeau Indian Reservations in that State.

The State traces its title back to the act of Congress of August 6, 1846, authorizing the people of Wisconsin Territory to form a state constitution and providing for the admission of such State into the Union.    9 Stat. 56, c. 89.

The defendant Hitchcock, as Secretary of the Interior, demurred to the bill upon the ground, among others, that it did not appear that the State was entitled to the relief asked.

The general question is whether the State has such interest, present or prospective, in the lands in dispute as to preclude their being administered by the Secretary of the Interior for the benefit of certain Indians.

The case, as presented by the record and by official documents of which judicial notice may be taken, is as follows:

On the twenty-eighth day of March, 1843, by a treaty between the United States and the Chippewa Indians of "the Mississippi and Lake Superior," the latter ceded to the United States all the country embraced within a specified boundary, including the lands here in controversy.   The second and third articles of that treaty provided: "Art. 2. The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges *of occupancy, until required to remove by the President of the United States,* and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.   Art. 3. It is agreed by the parties to this treaty that whenever the Indians shall be required to remove from the ceded district, all the unceded lands belonging to the Indians of Fond du Lac, Sandy Lake, and Mississippi bands shall be the common property and home of all the Indian party to this treaty."   In consideration of the above cession the United States (art. 4) engaged to pay the Indians annually for twenty-five years certain sums; and this consideration for the ceded lands was paid by the United States.   Revision of Indian Treaties, 217.

By an act of Congress approved August 6, 1846, the people of the then Territory of Wisconsin were authorized to form a consti-

tution and state government for the purpose of being admitted
into the Union on an equal footing with the original States
in all respects whatsoever, with certain specified boundaries.
The seventh section of that act was as follows: "That the fol-
lowing propositions are hereby submitted to the convention
which shall assemble for the purpose of forming a constitution
for the State of Wisconsin, for acceptance or rejection; and if
accepted by said convention, and ratified by an article in said
constitution, they shall be obligatory on the United States:
'First. That section numbered sixteen, in every township of
the public lands in said State, and, where such section has been
sold or otherwise disposed of, other lands equivalent thereto,
and as contiguous as may be, shall be granted to said State for
the use of schools. . . .' "   9 Stat. 57.

The conditions prescribed by the enabling act of 1846 were
duly accepted by Wisconsin, and that Territory was admitted
into the Union as a State by an act of Congress approved
May 29, 1848.   2 Charters and Constitutions, 2029; 9 Stat. 233.

By a treaty made and concluded September 30, 1854, be-
tween the United States and the Chippewa Indians of Lake
Superior and the Mississippi, and which treaty was proclaimed
January 29, 1855, 10 Stat. 1109, the Chippewas of Lake Su-
perior ceded to the United States the lands theretofore owned
by them in common with the Chippewas of the Mississippi
within the present boundary of Minnesota and lying east of a
certain boundary.   The Chippewas of the Mississippi assented
to that cession and agreed that the whole amount of the con-
sideration money for the country ceded as above should be paid
to the Chippewas of Lake Superior, the latter relinquishing to
the Chippewas of the Mississippi all their interest in and claims
to the lands theretofore owned by them in common, lying west
of the above boundary line.

The lands described in the first article of the treaty of 1854
are within the present State of Minnesota and constitute no
part of the land embraced in the treaty of 1843.

By the second article of that treaty the United States agreed,

among other things, to set apart and withhold from sale certain lands for the use of the La Pointe band and such other Indians as might settle with them. For the other Wisconsin bands, a tract of land was to be set apart and withheld from sale, "lying about Lac de Flambeau, and another tract on La Court Orielles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President." The lands described in that article of the treaty of 1854 to be set apart and withheld from sale "for the La Pointe band" and "for the other Wisconsin bands" *were part of the lands ceded to the United States by the treaty of* 1843.

The third article of the treaty was in these words: "Article 3. The United States shall define the boundaries of these reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age eighty acres of land for his or their separate use; and he may at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patent therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations respecting the disposition of the lands in case of the death of the head of a family or a single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts, or otherwise, as shall be necessary to prevent interference with any vested rights. All necessary roads, highways and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases."

The bill alleges: "That under the enabling act of Congress

aforesaid and under the state constitution and under and in view of the cession of their lands by said Chippewa Indians, contained in said treaty of 1843, all of the lands surveyed and to be surveyed as sections 16 of the various townships within the territory covered by said treaty vested in the State of Wisconsin, and said State of Wisconsin has at all times heretofore, since its admission to the Union, claimed a right to the fee of all lands in sections 16 in the several townships within said reservations, and, since the sectional survey thereof by the United States, has claimed the actual fee in said sections and has exercised dominion and ownership over the same and has issued sundry and divers patents to divers persons and corporations for portions thereof, sundry of which persons and corporations, grantees of the State as aforesaid, have also exercised acts of ownership thereof, and have paid taxes and made improvements thereon, and have cut and hauled timber therefrom until forbidden by orders of the defendant, Ethan Allen Hitchcock, as Secretary of the Interior of the United States, as hereinafter more particularly mentioned; that patents for all of said sections 16 within said La Pointe Reservation have heretofore been issued by said State to divers parties, and patents upon about fourteen forties of said sections 16 within said Lac Du Flambeau Reservation have been issued by said State to divers parties, and there still remain about twenty-nine forties in said sections 16 within said Lac Du Flambeau Reservation, the title to which is still in and claimed by said State. That under the treaty of 1854 aforesaid and in carrying out its provisions, the said Secretary of the Interior has proceeded, through the United States Indian Department, to allot from time to time to the various members of said tribes of La Pointe bands of Indians and to various members of the Wisconsin bands on said Lac Du Flambeau Reservation eighty acres per capita of lands within said reservations and has caused patents therefor to be issued to the members of said tribes as individuals, and such members have become full citizens of the United States, and have terminated their tribal relations, and have ceased to

occupy any material part of said reservation in common. That the lands within said reservation, exclusive of the lands in section 16, are sufficient to secure eighty acres to each individual Indian who has hitherto appeared and claimed a right to an allotment. That no allotment has hitherto been allowed to any member of said tribes of Indians of any land embraced within any of said sections 16. That beginning about the year 1899, and from thence hitherto, the defendant, Ethan Allen Hitchcock, as Secretary of the Interior, and the Commissioner of the Indian Office of the United States, and divers agents and servants under them, have set up on behalf of said La Pointe and other bands of Indians, or the members thereof, a claim of interest or title in and to sections 16 aforesaid in the reservation townships aforesaid, paramount and adverse to the title of the State of Wisconsin, and have claimed and continue to claim that said sections 16 are still held by the United States in trust for said Indians to the same extent as other lands in said reserved townships, and have forbidden purchasers of such lands holding patents from the State to enter or make improvements or cut any timber thereon, and have thereby cast a cloud upon the title of the State and its grantees to said lands, and have interfered with, and are continuing to interfere with the use and enjoyment of the same by the owners thereof. . . . That by Chap. 95 of the Laws of the State of Wisconsin for the year 1903, approved April 20, 1903, the Attorney General of the State of Wisconsin was duly authorized to institute proceedings in this court under the provisions of the act of Congress passed March 2, 1901, and hereinbefore referred to, to determine the rights of said State to what are commonly known as school lands within any reservation or Indian cession within said State, where any Indian tribe claims any right to or interest in said lands, or to the disposition thereof by the United States, and particularly to determine the title of the lands embraced within sections 16 in the several townships constituting the present Bad River or La Pointe and the Flambeau Indian Reservations within said State."

*Mr. T. W. Spence*, with whom *Mr. L. M. Sturtevant*, Attorney·
General of the State of Wisconsin,· was on the brief, for com-
plainant:

The cession of the Chippewa territory in Wisconsin in 1843
conveyed the whole Indian title. and right of occupancy.

There can be no doubt that these Indians parted with every
vestige of claim, legal, equitable, or as wards of a Nation, to·
every parcel of land embraced within the treaty, except a li-
cense to wander over any part which the United States failed
otherwise to dispose of, until ordered by the President to get
off.    The United States was not, by such a stipulation for tem-
porary occupancy, disabled from, or fettered in, making a dis-
position of specific portions of the lands.

Such a privilege of temporary Indian occupancy was con-
sidered in *Ward* v. *Race Horse*, 160 U. S. 504, and held to be
destroyed and terminated by the mere act of admitting the
State (Wyoming) into the Union.    It is characterized by the
court (p. 510) as "temporary and precarious" and not in any
way to stay the advance of settlement and improvement or
the jurisdiction of the newly created State over the territory.
Although not expressly overruling the *ex parte* decision in *Uni-
ted States* v. *Thomas,* the principles announced are incompatible
with the language relied upon by the Government in the ·
Thomas case.

The United States, having the complete title to the land,
unincumbered· by anything but a temporary license to roam;·
and hunt over it, when Wisconsin was admitted as a State,
could not after its specific grant to the State make such license
a basis or consideration for creating an adverse title, whether
the land were surveyed or not at the time of the grant.

From 1843 to 1854 there was no Chippewa Indian Reservation
or country in Wisconsin.    It had all been ceded by the treaty
of 1843.    The members of the tribe hunted and fished over it
merely by sufferance.    The United States had and exercised
the right during that period, at will, to dispose of any portion
to settlers or otherwise, and in 1848 contracted with and

granted to the new State of Wisconsin, for school purposes, practically one thirty-sixth of the territory covered by the cession of 1843 and not previously disposed of. The right of Wisconsin to the land covered by such grant thereupon became absolute; the legal title awaited the survey, but the *jus ad rem* arose simultaneously with the birth of the State. *Beecher* v. *Wetherby*, 95 U. S. 524. *Minnesota* v. *Hitchcock*, 185 U. S. 390, distinguished.

The treaty of 1854 expressly saved all precedent rights granted by the United States under the title acquired by it through the cession by the Indians in 1843.

Under the treaty of 1843 the Indians reserved no title, and under the treaty of 1854 acquired no right to any particular land in the territory. The intervening title granted by the United States to the State is paramount, and that the treaty of 1854 only promised the Indians the equivalent in area or acres of the reservations provided for. *Gaines* v. *Nicholson*, 9 How. 365.

The State had a grant of explicitly designated portions of the land within the territory, not in every instance surveyed at the time of the grant, but unmistakably ascertainable by survey. As far as the lands in question are concerned, the inclosing township and range lines were actually surveyed by the Land Department prior to 1854.

The conditions in the case of *Minnesota* v. *Hitchcock*, 185 U. S. 373, are, therefore, entirely reversed in the present case. In the *Minnesota* case the lands involved were unceded Indian lands at the date of Minnesota's admission into the Union.

*Mr. A. C. Campbell*, special assistant to the Attorney General, with whom *Mr. Frank L. Campbell*, Assistant Attorney General, was on the brief, for defendant:

The grant describes and is confined to public lands. Lands are not public unless they are subject to sale or other disposal under the general land laws. They are not subject to sale and disposal under such laws if, at the date of the grant, they are

burdened with an Indian right of occupancy. Nor are they public lands, as the term is understood, until surveyed into townships and designated by sections. *Newhall* v. *Sanger*, 92 U. S. 761, 763; *Leavenworth &c. Railway Company* v. *United States*, 92 U. S. 733, 741; *Missouri, Kansas and Texas Railroad Company* v. *Roberts*, 152 U. S. 114, 119; *Northern Pac. R. R. Co.* v. *Musser-Sauntry Company*, 168 U. S. 604, 609; *In re Tyler B. Thompson*, 32 L. D. 468, 470.

No title to sections mentioned in a school grant vests in a State until the same are identified by a public survey. *Gaines* v. *Nicholson*, 9 How. 356, 365; *Cooper* v. *Roberts*, 18 How. 173, 179; *Sherman* v. *Buick*, 93 U. S. 209, 214, 215; *Heydenfeldt* v. *Daney Gold &c. Company*, 93 U. S. 634, 640; *Beecher* v. *Wetherby*, 95 U. S. 517, 524; *Water & Mining Company* v. *Bugbey*, 96 U. S. 165, 167; *Minnesota* v. *Hitchcock*, 185 U. S. 373, 393; *Bullock* v. *Rouse*, 81 California, 591, 593, *State of Colorado*, 6 L. D. 412, 415; *Barnhurst* v. *State of Utah*, 30 L. D. 314, 317; *Mahoganey Number 2 Lode Claim*, 33 L. D. 37.

Sections of land contemplated by a school grant which, while unsurveyed, fall within an Indian reservation are subject to the Indian right of occupancy, and until such occupancy has been extinguished such sections are in suspension. Cases *supra* and *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 48; *Wilcox* v. *Jackson*, 13 Pet. 498, 513; *Minnesota* v. *Hitchcock*, 185 U. S. 373, 388, 389; *Barker* v. *Harvey*, 181 U. S. 481; *United States* v. *Rickert*, 188 U. S. 432; *Scott* v. *Carver*, 196 U. S. 100, 109, 111; *United States* v. *Winans*, 198 U. S. 371, 380, 381; *Northern Pacific Railroad Company* v. *Maclay et al.*, 61 Fed. Rep. 554, 556.

If, at the time of the public survey, a tract of land contemplated by a school grant is encumbered by a right of occupancy in an Indian tribe, the State may elect to take equivalent lands, or it may wait until such right of occupancy has been extinguished and take the land contemplated. *Minnesota* v. *Hitchcock*, 185 U. S. 373; *State of Colorado*, 6 L. D. 412; *State of Colorado*, 12 L. D. 70, 71; *State of Louisiana*, 17 L. D. 440.

At the date of a school grant to a State, if the sections are

not identified by the Government survey, and are within an Indian reservation, Congress is not obliged to transform them from their original status, and may dispose of them for other purposes. *Minnesota* v. *Hitchcock,* 185 U. S. 373.

It is not necessary that the treaty providing for a reservation should describe the particular tract to be thereafter, occupied by the Indians, nor is it necessary that a particular tract be designated for that purpose by Congress or by the President. If, after the treaty is signed, the Indians occupy a particular tract without objection by, or interference from, the Government, such tract is a reservation to the same extent as though it had been specifically designated by the treaty. *United States* v. *Carpenter,* 111 U. S. 347, 349; *Spalding* v. *Chandler,* 160 U. S. 394, 404; *Minnesota.* v. *Hitchcock,* 185 U. S. 373, 390; *State of Minnesota,* 22 L. D. 388.

A treaty which provides for a reservation for the Indians is a grant of rights from and not to them, and a retention to them of rights not granted. *United States* v. *Winans,* 198 U. S. 371, 381.

The Secretary of the Interior, under the direction of the President, has the power, and it is his duty, to prevent intrusion upon Indian reservations and to remove intruders therefrom. *Morris* v. *Hitchcock,* 194 U. S. 384, 391, 392; *United States* v. *Mullin,* 71 Fed. Rep. 286, 288, 289.

Where a treaty with an Indian tribe, or an act of Congress, provides that an Indian reservation shall be allotted to the Indians in severalty, the Secretary of the Interior, pending. allotment, has jurisdiction over the reservation and the power to remove intruders therefrom, and the courts will not interfere with his action in respect to allotment or with the exercise of his power to remove intruders. *Morris* v. *Hitchcock, supra; Brown* v. *Hitchcock,* 173 U. S. 473, 477; *New Orleans* v. *Payne,* 147 U. S. 261, 264.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

The State contends that the effect of the treaty of 1843 was

that the Chippewa Indians released to the United States all of their claim of title or interest in or to the lands therein described and each and every part thereof, and ceded the same to the United States, which thereupon became the absolute owner thereof free from any claim of said Indians; and that the State, upon its acceptance of the conditions prescribed by the enabling act of 1846, and its admission into the Union, became vested with an absolute right in and to all the sections 16 within said territory previously surveyed, as well as to the lands subsequently surveyed by the United States, with the right in the State to have the temporary possession or occupancy of the Indians terminated by the United States.

. The determination of the question suggested by this contention and the decision of this case is controlled by *United States* v. *Thomas*, 151 U. S. 577. That case involved the rights of the State of Wisconsin in and over certain lands in the La Court Orielles Reservation, as established for the benefit of the Chippewa Indians. Thomas, an Indian of the Chippewa tribe, was indicted for the murder of another Indian of the same tribe, committed within the limits of that reservation. The evidence showed that the offense was committed upon section 16 in a township embraced in the reservation. The accused contended that by the provisions of the enabling act by which Wisconsin was admitted into the Union, section 16 in every township in that State was ceded to it for school purposes, and could not be subsequently taken by the United States as part of an Indian reservation. It appeared that previous to the alleged murder, namely in 1859, the section upon which the crime was committed, had been settled, platted and set apart by the United States as a part and parcel of said reservation and was continuously thereafter occupied by the Indians as such, although claimed and sold by the State as and for a part of the school land ceded to it by the act of Congress. By act of Congress, approved March 3, 1885, c. 341, 23 Stat. 362, 385, it was provided that Indians committing certain crimes, among them murder, "against the person or property of another Indian or

other person within the boundaries of any State of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States." So the question was distinctly presented as to the relative rights of the State and the Indians in said section 16 within the Indian reservation on which the alleged murder was committed.

This court said: "The Indians have never been removed from the lands thus ceded (meaning by the treaty of 1842) and no executive order has ever been made for their removal and no change has taken place in their occupancy of the lands except as provided by the treaty of September 30, 1854, 10 Stat. 1109. By that treaty the Chippewas ceded a large portion of their territory, previously retained in Wisconsin and elsewhere, and provision was made in consideration thereof for the formation of permanent reservations for their benefit, each to embrace three full townships and their boundaries to be established under the direction of the President. One of these included the tract comprised in the La Court Orielles Reservation. In the provision for these reservations nothing was said of the sixteenth section of any townships, and it is clear that it was not contemplated that any section should be left out of any one of them. The land reserved was to be, as near as possible, in a compact form, except so far as the meandered lakes were concerned. When the townships composing these reservations were surveyed, the sixteenth section was already disposed of in the sense of the enabling act of 1846. It had been included within the limits of the reservations. As it will be seen by the treaty of 1842, ratified in 1843, which was previous to the enabling act, the Indians stipulated for the right of occupancy to the lands. That right of occupancy gave them the enjoyment of the lands until they were required to surrender it by the President of the United States, which requirement was never made. Whatever right the State of Wisconsin acquired

by the enabling act to the sixteenth section was subordinate to this right of occupancy for which the Indians stipulated and which the United States recognized. The general rule established by the Land Department in reference to the school lands in the different States is that the title to them vests in the several States in which the land is situated, subject to any prior right of occupation by the Indians or others which the Government had stipulated to recognize."

Again: "We therefore are of the opinion that by virtue of the treaty of 1842, in the absence of any proof that the Chippewa Indians have surrendered their right of occupancy, the right still remains with them, and that the title and right which the State may claim ultimately in the sixteenth section of every township for the use of schools is subordinate to this right of occupancy of the Indians, which has, so far as the court is informed, never been released to any of their lands, except as it may be inferred from the provisions of the treaty of 1854. That treaty provided for the permanent reservations, which included the section in question. The treaty did not operate to defeat the prior right of occupancy to that particular section, but, by including it in the new reservations, made as a condition of the cession of large tracts of land in Wisconsin, continued it in force. The State of Wisconsin, therefore, had no such control over that section or right to it as would prevent its being set apart by the United States with the consent of the Indians, as a part of their permanent reservation. So, by authority of their original right of occupancy, as well as by the fact that the section is included within the tract set aside as a portion of the permanent reservation in consideration of the cession of lands, the title never vested in the State, except as subordinate to that right of occupation of the Indians." *United States* v. *Thomas*, 151 U. S. 577, 582, 584.

It is true that the *Thomas* case did not have reference to the particular Indian reservations involved in the present suit—the Bad River or La Pointe and Flambeau Reservations—but only to the La Court Orielles Indian Reservation. But all

three reservations had their origin alike in the same treaties—that of 1842, proclaimed in 1843, and that of 1854; and the effect of those treaties was considered in that case in connection with the enabling act of 1846 under which the State now claims, as it claimed in that case, absolute title to and full control over all the sections 16 named in that act. What the court said in the *Thomas* case as to the rights of Indians in virtue of their occupancy of the lands set apart for their use in the La Court Orielles Reservation, is strictly applicable to the rights of the Indians who have occupied, and, so far as appears, still occupy, the Bad River or La Pointe and Flambeau Reservations. We could not sustain the claim of the State in the present suit without overruling the principles announced in the *Thomas* case; and that we are not disposed to do. The principles of the *Thomas* case were recognized and enforced in *Minnesota* v. *Hitchcock*, 185 U. S. 373, 391 *et seq.*, which related to an act of Congress for the admission of Minnesota into the Union, and which act contained a provision similar to the one found in the enabling act for Wisconsin, namely, that certain sections "in every township of public lands in said State, and where either of said sections or any part thereof has been sold or otherwise disposed of, other lands, equivalent thereto and as contiguous as may be, shall be granted to said State for the use of schools."

Without repeating all that was said in previous decisions, we hold, on the authority of those decisions, that the State is not entitled to the relief asked nor to any order that would interfere, at this time, with the administration by the Interior Department, of the lands in question for the benefit of the Indians for whom the Bad River or La Pointe Reservation and the Flambeau Reservations were established. Consequently, the bill must be dismissed.

*It is so ordered.*