COBBAN v. HYDE.

(District Court, N. D. California, Second Division. November 17, 1913.)

No. 15,456.

1. PUBLIC LANDS (§ 52*)—SCHOOL LANDS—EFFECT OF GRANT TO STATE.

Under Act Cong. Feb. 14, 1859, c. 33, 11 Stat. 383, admitting Oregon into the Union, which provided that sections 16 and 36 in every township of public lands, and, where either of such sections or any part thereof had been sold or otherwise disposed of, other lands equivalent thereto and as contiguous as might be, should be granted to the state for the use of schools, where a sixteenth section was, by executive proclamation, included in a forest reserve prior to the survey of the township, title thereto never passed to the state, and its patent to a purchaser was void, since there was no present grant or promise to grant the particular sections, and, until surveyed, they were subject to other sale or disposition by the United States.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 139–142, 146, 147; Dec. Dig. § 52.*]

2. GUARANTY (§ 36*)—GUARANTY OF TITLE—OPERATION AND EFFECT.

Where a land attorney, upon the sale of the selection right of a purchaser of a sixteenth section which was included in a forest reserve, executed a guaranty that the land was within such forest reservation and had been duly and properly surrendered to the United States, that a lieu selection had been made and rejected, that no other selection in lieu of the surrendered land had been made, and that the vendor's right remained and was good and valid and would be recognized by the Commissioner of the General Land Office, and a selection by the vendee was thereafter canceled on the ground that title to the sixteenth section did not pass to the state, and that the vendor's purchase was void, the guaranty amounted to a guaranty of the validity of the vendor's title and not merely a warranty of the regularity of the various steps therein recited; and hence notes given by him in fulfillment of the guaranty were not unenforceable for want of consideration.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. §§ 38–45; Dec. § 36.*]

At Law. Action by R. M. Cobban against F. A. Hyde. Judgment for plaintiff.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

This is an action to recover on two promissory notes executed by defendant to plaintiff, dated December 31, 1909, one for $2,500, payable one year after date, and the other for $5,100, payable two years after date, with provision in each for attorney's fees for collection in the event of action being necessary. The execution and delivery of the notes is admitted; but the defense is a want of consideration. The circumstances under which the notes were given are these: The act of Congress of February 14, 1859 (chapter 33, 11 Stat. 383), providing for the admission of Oregon into the Union, declares that "sections 16 and 36 in every township of public lands in said state, and where either of said sections or any part thereof has been sold or otherwise disposed of, other lands equivalent thereto and as contiguous as may be, shall be granted to the state for the use of schools." The provisions of this act were accepted by the Legislature of Oregon on June 3, 1859. On June 28, 1889, the state of Oregon issued patents to section 16, township 9 south, range 5 east, Willamette Meridian, to A. S. Baldwin before survey of the townships, the survey of township 9 south, range 6 east, being completed August 5, 1893, and that of township 9 south, range 5 east, August 26, 1893, but not approved by the Secretary of the Interior until April 23, 1894. Prior to such approval, the three sections were included in the Cascade Forest Reserve by executive proclamation of September 28, 1893 (28 Stats. at L. 1240).

By the act of Congress of June 4, 1897 (chapter 2, 30 Stat. 36), an owner of title to land within a forest reserve was granted the right to relinquish the same to the United States and to select in lieu thereof vacant land of the United States, open to settlement, outside of said reserve and equal in area to that relinquished. The selection right consequent upon such relinquishment was commonly termed by land dealers "Forest Reserve Scrip"; such right being saleable, the sale being evidenced by a power of attorney to make selection in a land office, an abstract of title, and a power of attorney to sell the selected land. On June 28, 1899, proceeding under that act, Baldwin, with his wife (joined with him to carry her dower right under the laws of Oregon), executed a deed of relinquishment of the three sections to the United States, which deed was duly recorded and filed with the Commissioner of the General Land Office. Thereupon Baldwin made a lieu selection, based on such relinquished sections, in a Washington Land Office, and filed it with the deed and an abstract of title. This selection was rejected by the Secretary of the Interior and canceled on grounds which are not disclosed but which it is conceded were other than because of any claimed defect of title to the base land. After such cancellation, Baldwin granted to defendant herein, a land attorney, authority to sell his further selection right based on said relinquished sections. On February 25, 1901, defendant, in consideration of $7,680, sold the selection right to this plaintiff, and caused Baldwin and wife to execute and deliver to plaintiff a power of attorney to make a lieu selection, and also a power of attorney to sell the selected land. As part of the same transaction defendant executed to plaintiff a covenant and guaranty embodying these terms: "First. That the said land is within the Cascade Range Forest reservation in the state of Oregon. Second. That the said land has been duly and properly surrendered to the United States. Third. That the original deed to the United States of said land is now on file in the office of the Commissioner of the General Land Office, with the selection by said Baldwin of the southeast quarter of section thirty-one (31), the northwest quarter of section thirty-two (32), the northwest quarter, the south half of the northeast quarter, and the north half of the southeast quarter of section thirty-four (34), the north half and the southwest quarter of section thirty-five (35), the northeast quarter of section twenty-seven (27), the southwest quarter of section twenty-three (23), the south half of section fourteen (14), and the southwest quarter of section thirteen (13), in township three (3) north of range five (5) east, Willamette Meridian. Fourth. That the said selection has been rejected by the Secretary of the Interior. Fifth. That the said Baldwin has made no other selection in lieu of said surrendered land, and his right remains and is good and valid, and will be recognized by the Commissioner of the General Land Office."

On April 10, 1901, plaintiff, acting under the power of attorney to select, filed with the register and receiver of the United States Land Office at Boise,

Idaho, an application to select, under the act of June 4, 1897, certain lands in townships 11 and 12 north, range 3 east, Boise Meridian. The Commis-- sioner of the General Land Office, on March 16, 1909, held the selection for cancellation, upon the ground that, as the survey of the Oregon base lands had not been approved until after the executive proclamation creating the Cascade Forest Reserve and including them therein, this action reserved them from the category of public lands, and that title thereto never passed from the United States to the state of Oregon; and therefore that the patent from that state to Baldwin was void and of no effect to carry title to the latter. On appeal to the Secretary of the Interior the decision of the Commissioner was affirmed, and on October 8 1909, the Commissioner made a final order canceling the Boise selection.

Thereafter plaintiff, treating the decision of the Secretary as final, request- ed defendant to fulfill his guaranty and on December 31, 1909, after some negotiation, defendant, conceding his obligation to reimburse plaintiff, but not having the ready money, executed the promissory notes in suit. Subsequently defendant co-operated with plaintiff in recovering from the state of Oregon the amount of purchase price which had been paid that state for the land, and the sum recovered, $2,045.35, was credited on the note for $2,500, in ac- cordance with the agreement of the parties. Nothing further having been paid on the notes, this suit was brought.

Cushing & Cushing, of San Francisco, Cal., for plaintiff.

M. W. McIntosh, of San Francisco, Cal., and Robert F. Bell, of Oak- land, Cal., for defendant.

VAN FLEET, District Judge (after stating the facts as above). [1] The theory of the defense, which is quite urgently presented, is, in sub- stance, that the terms of the Oregon enabling act operated as a grant in præsenti, and, upon the acceptance by the state of its provisions, the state became clothed with an indefeasible right to all the public lands within its borders which should thereafter be ascertained by actual sur- vey to be embraced within the sixteenth and thirty-sixth sections; that, although title to the particular sections did not formally vest until the survey thereof was approved, the state was potentially clothed with the title for the reason that by the force of its terms the sixteenth and thirty-sixth sections were irrevocably appropriated to the use of the state, subject only to be thereafter identified by survey, and were there- by withdrawn from other sale or disposition by the United States; that it was thereafter not within the power of the Congress, or the president acting under subsequent legislation, to reserve or appropriate such lands or any part thereof to any other use; that the state had a perfect right to sell such lands in anticipation of the survey, and, upon such survey being made and approved, it inured to the benefit of the state and its grantees and operated to vest absolute title in fee thereto.

From this premise it is argued that, notwithstanding the decision of the Land Department to the contrary, a perfect title to the lands in- volved had vested in Baldwin at the time of the sale by defendant to plaintiff and the giving of the guaranty above set out; that the latter paper is therefore not to be construed as guaranteeing in Baldwin a valid title, which he already had, but as warranting only the regulari- ty of the various steps therein recited as vesting such title; that, so construed, the guaranty affords no consideration for the notes sued on, but they must be held to have been given under a misapprehension by defendant of his legal obligation thereunder. From this statement it

will be observed that the essential question upon which the defense rests is whether the language of the enabling act is susceptible of the construction which defendant thus seeks to place upon it.

In reaching his conclusion that title to the lands involved never vested in the state of Oregon, the Secretary of the Interior said in his opinion:

"It is a well-established principle that the title of the state to the granted sections does not vest until they have been designated by an approved survey, and that, until the survey of the lands and the vesting of title, Congress has absolute power and control over the granted sections, and may dispose of them in any manner it may deem proper, leaving the state to its right to indemnity therefor. That has been so frequently determined by the Supreme Court as to be no longer a subject of controversy Heydenfeldt v. Daney Gold Mining Co., 93 U. S. 634 [23 L. Ed. 995]. Furthermore, the question was directly decided in Minnesota v. Hitchcock, 185 U. S. 373–400 [22 Sup. Ct. 650, 46 L. Ed 954]; the school grant to the state of Minnesota being totidem verbis the same as the grant to the state of Oregon. In that case the court said that 'the act of admission with its clause in respect to school lands was not a promise by Congress .that under all circumstances, either then or in the future, these specific school sections were or should become the property of the state. The possibility of other disposition was contemplated, the right of Congress to make it was recognized, and provision made for the selection of other lands in lieu thereof.' See, also, Wisconsin v. Hitchcock, 201 U. S. 202 [26 Sup. Ct. 498, 50 L. Ed. 727]."

These views of the Honorable Secretary would seem to be fully sustained by the authorities referred to by him.

Thus in Heydenfeldt v. Daney G. M. Co., there cited, involving a construction of the Nevada enabling act, which, unlike the one under consideration, contained express terms of present grant of the sixteenth and thirty-sixth sections, the court, in a controversy arising between the plaintiff, a patentee of the state of a part of a sixteenth section, and the defendant holding a subsequent mineral patent from the United States based on an entry made after the admission of the state, but prior to the survey of the land, after a careful review of the provisions of the act and a consideration of the sense in which it should be construed, reached the conclusion that the title to the land involved had never vested in the state, and that the mineral title should prevail. It is there said:

"This interpretation, although seemingly contrary to the letter of the statute, is really within its reason and spirit It accords with a wise public policy, gives to Nevada all she could reasonably ask, and acquits Congress of passing a law which in its effects would be unjust to the people of the territory. Besides, no other construction is consistent with the statute as a whole, and answers the evident intention of its makers to grant to the state in præsenti a quantity of lands equal in amount to the sixteenth and thirty-sixth sections in each township. Until the status of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them; and if, in exercising it, the whole or any part of a sixteenth or thirty-sixth section had been disposed of, the state was to be compensated by other lands equal in quantity, and as near as may be in quality. By this means the state was fully indemnified, the settlers ran no risk of losing the labor of years, and Congress was left free to legislate touching the national domain in any way it saw fit, to promote the public interests."

So in Minnesota v. Hitchcock, 185 U. S. 373, 22 Sup. Ct. 650, 46 L. Ed. 954, involving the granting clause of school lands in the Minnesota

enabling act, which, as suggested by the Secretary of the Interior, is in the precise terms of the grant to Oregon, in a controversy over lands found upon survey to be embraced within sixteenth and thirty-sixth sections, but where, at the time of the admission of the state and the date of the survey, the lands were within an Indian reservation, it was held, after an exhaustive examination of the question, that the lands, being thus reserved at the date of survey, were not "public lands," within the meaning of the grant, and the title of the state had not attached. To quote one or two of the more pertinent passages from that case, after referring to the school land clause it is said:

"It will be perceived that this grant was of 'public lands.' It was held in Newhall v. Sanger, 92 U. S. 761, 763 [23 L. Ed. 769] that: 'The words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws.' * * * 'We agree that, until the survey of the township and the designation of the specific section, the right of the state rests in compact, binding, it is true, the public faith, and dependent for execution upon the political authorities.' * * * But, while this is true, it is also true that Congress does not, by the section making the school land grant, either in letter or spirit, bind itself to remove all burdens which may rest upon lands belonging to the government within the state, or to transform all from their existing status to that of public lands, strictly so called, in order that the school grant may operate upon the sections named. It is, of course, to be presumed that Congress will act in good faith; that it will not attempt to impair the scope of the school grant; that it intends that the state shall receive the particular sections or their equivalent in aid of its public school system. But considerations may arise which will justify an appropriation of a body of lands within the state to other purposes, and, if those lands have never become public lands, the power of Congress to deal with them is not restricted by the school grant, and the state must seek relief in the clause which gives it equivalent sections. If, for instance, Congress in its judgment believes that, within the limits of an Indian reservation or unceded Indian country (that is, within a tract which is not strictly public lands), certain lands should be set apart for a public park, or as a reservation for military purposes, or for any other public uses, it has the power, notwithstanding the provisions of the school grant section."

And finally it is said:

"In other words, the act of admission with its clause in respect to school lands was not a promise by Congress that under all circumstances, either then or in the future, these specific school sections were or should become the property of the state. The possibility of other disposition was contemplated, the right of Congress to make it was recognized, and provision made for a selection of other lands in lieu thereof."

The case of Wisconsin v. Hitchcock, 201 U. S. 202, 26 Sup. Ct. 498, 50 L. Ed. 727, involves the same principles.

These authorities would seem to be conclusive of the present question unless this case is excepted from the principles thus announced by the decision in Beecher v. Wetherby, 95 U. S. 523, 24 L. Ed. 440, the sole reliance of defendant to sustain the contentions advanced in support of his defense. In that case, considering the act for the admission of Wisconsin and the effect of the clause granting the sixteenth sections for school purposes, it is said by the court, speaking through Mr. Justice Field:

"It matters not whether the words of the compact be considered as merely promissory on the United States, and constituting only a pledge of a grant in future, or as operating to transfer the title to the state upon her acceptance

of the propositions as soon as the sections could be afterwards identified by the public surveys. In either case, the lands which might be embraced within those sections were appropriated to the state. They were withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted. All that afterwards remained for the United States to do with respect to them, and all that could be legally done under the compact, was to identify the sections by appropriate surveys. * * * They could not be diverted from their appropriation to the state. * * * With this identification (by survey) of the sections, the title of the state, upon the authority cited, became complete, unless there had been a sale or other disposition of the property * * * previous to the compact with the state. No subsequent sale or other disposition, as already stated, could defeat the appropriation."

Defendant contends that this language had the effect to overrule Heydenfeldt v. Daney and to create a rule of property which must be read into the contract between the parties here and which could not be thereafter affected by the case of Minnesota v. Hitchcock, decided subsequently to the making of that contract. While, considered apart from the facts with reference to which it was used, this language might be regarded at first glance to be somewhat at variance with the principles announced in the cases referred to, when read with reference to the case before the court, that seeming inconsistency fades out, and the case is found not to be out of harmony with either Heydenfeldt v. Daney or the subsequent case of Minnesota v. Hitchcock. The court was there considering a case where, at the time of the survey of the land in controversy (a sixteenth section), the only obstacle standing in the way of the vesting of title in the state under its school grant was the Indian title covering it, but which latter the government had thereafter removed by treaty with the Indians; and the question before the court was whether a patent issued by the state after the Indian title had been wiped out should prevail to carry title over a patent from the United States issued under an act of Congress subsequently passed providing for a sale of the Indian lands. The court held, in substance, that when the Indian title was disposed of under the treaty, and, there having been no other disposition of the land by the United States up to that time, the title to the school lands within the reservation, they having been previously identified by survey, immediately vested in the state, and that it was not thereafter in the power of Congress to make other disposition of such lands; that the act providing for the sale of the Indian lands must therefore be construed as not intended to apply to the school sections embraced within the limits of the larger tract directed to be sold.

Addressed to such a case, the language quoted is strictly applicable; but that it has no proper application to a case like this, where, before the definition of the land by survey, the government had seen fit to reserve it for other use and thereby interpose a bar to the vesting of title in the state, is quite as obvious. The distinction between that case and the present is aptly stated in Minnesota v. Hitchcock, where the case is cited and the language relied upon by defendant is quoted and fully considered, and where, referring to the question there decided, the court say:

"But this case stands on entirely different grounds. Before any survey of the lands, before the state right had attached to any particular sections, the United States made a treaty or agreement with the Indians, by which they accepted a cession of the entire tract under a trust for its disposition in a particular way. The question is not as to the construction of two separate statutes, but as to the scope and effect to be given to a treaty or agreement with the Indians, and whether it is to be narrowed in its scope by any rules applicable to the construction of statutes, rules with which it is not to be supposed the Indians were familiar."

That Beecher v. Wetherby is to be given no such effect as that contended for here is thus fully disclosed by the discussion in the Minnesota case; and that it was not regarded as in any way infringing upon the principles announced in Heydenfeldt v. Daney is made manifest by the fact that the latter case is therein cited and approved.

[2] From these considerations it must be held, in accordance with the ruling of the Secretary of the Interior, that title to the lands in question never vested in the state of Oregon, and that consequently it did not pass to Baldwin under his patent. It follows that the effect of defendant's guaranty cannot be limited as claimed, but must be construed in accordance with the fair implication of its terms, and, as defendant himself has heretofore construed it, as guaranteeing the validity of Baldwin's title. So construed, the defense of want of consideration cannot prevail. This conclusion renders it unnecessary to notice the further ground of recovery urged by plaintiff.

Let judgment be entered for the plaintiff for the amount due on the notes, with interest as prayed, together with an attorney's fee of $400.