**BENNETT COUNTY, SOUTH DAKOTA,**
a Public Corporation, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 18935.

United States Court of Appeals
Eighth Circuit.

April 24, 1968.

Robert J. Parker, State's Atty., Bennett County, Martin, S. D., for appellant; Frank L. Farrar, Atty. Gen. of State of South Dakota, Pierre, S. D., on the brief.

John G. Gill, Jr., Atty., Department of Justice, Washington, D. C., for appellee; Edwin L. Weisl, Jr., Asst. Atty. Gen., Department of Justice, Washington, D. C., Harold C. Doyle, U. S. Atty., Sioux Falls, S. D., and David V. Vrooman, Asst. U. S. Atty., Sioux Falls, S. D., on the brief.

Before MATTHES, GIBSON and HEANEY, Circuit Judges.

MATTHES, Circuit Judge.

Bennett County, South Dakota (hereinafter referred to as the County or appellant) appeals from the judgment of the district court permanently enjoining it from constructing, maintaining or using a road across certain land lying within its confines. United States v. Bennett County, South Dakota, 265 F.Supp. 249 (D.So.Dak.1967). Title to this land is in the United States, in trust, for the use and benefit of Newton and Doyle Cummings, enrolled members of the Oglala Sioux Tribe of Indians, of the Pine Ridge Reservation.[1] The land in question is wholly within the Pine Ridge Reservation.

Pursuant to the Act of June 14, 1862, c. 101, § 1, 12 Stat. 427, now codified in 25 U.S.C.A. § 185,[2] the United States sought to enjoin appellant from entering upon the land for the purpose of making repairs to the road without (1) securing permission from the Secretary of Interior, pursuant to the provisions of 25 U.S.C.A. § 311, or (2) acquiring the land by condemnation under the provisions of

---

1. The original allotments of the land in question were made under the provisions of the Act of March 2, 1889, 25 Stat. 888. Under this Act, title was to be held in trust for a term of 25 years, but this term has been extended and restrictions upon Indian lands continue to date. 25 U.S.C.A. § 462 provides:

   "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress."

   See also note following 25 U.S.C.A. § 348 and Poafpybitty v. Skelly Oil Company, 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed. 2d 1238 (1968).

2. § 185 provides:

   "Whenever any Indian * * * has had a portion of the lands belonging to his tribe allotted to him in severalty * * * the agent and superintendent of such tribe shall take such measures, not inconsistent with law, as may be necessary to protect such Indian in the quiet enjoyment of the lands so allotted to him."

25 U.S.C.A. § 357.[3] Since it was conceded that appellant had neither secured permission nor had condemned, the court concluded that an injunction should be granted against entry until such time as appellant received permission to repair the road, or alternatively, until an easement has been secured by condemnation.

Appellant rests its claim for reversal on the premise that other Congressional legislation has secured its right to enter the land for highway purposes, and that it need not secure permission under Section 311, or condemn under Section 357. Specifically, it submits that its authority to act has been granted under Section 8 of the "Public Highway Act" of 1866, c. 262, § 8, 14 Stat. 251, 253, now codified in 43 U.S.C.A. § 932, or in the alternative, that a section line highway easement was created by Section 21 of the Act of March 2, 1889, 25 Stat. 888, which established the Pine Ridge Sioux Reservation.

A brief historical outline of the transactions between the United States and the Oglala Sioux tribe will aid in properly understanding the positions of the parties and in resolving the question whether the County is entitled to a highway easement across allotted Indian lands within the Pine Ridge Reservation. The treaties and Congressional acts pertinent to this discussion are, (a) the "Treaty of Fort Laramie of 1851," 11 Stat. 749, reported in full II Kappler, Laws and Treaties (2d Edition 1904) 594; (b) the "Treaty of 1868," ratified 1869, 15 Stat. 635; (c) the Act of March 2, 1889, 25 Stat. 888 ("Act of 1889") and (d) the Act of July 26, 1866, c. 262, § 8, 14 Stat. 251, 253 (hereafter referred to as the "Highway Act of 1866").

The Treaty of Fort Laramie constituted an agreement bewteen various Indian tribes to cease hostilities against one another and against the people of the United States. It set off tribal boundaries and made the tribes responsible for any depredations committed within their respective territories.[4]

The Treaty of 1868 created the "Great Reservation" for the Sioux. By its terms lands were set off "for the absolute and undisturbed use and occupation of the Indians." The United States guaranteed that no persons would be allowed to pass over or settle upon the reserved lands. In return for government benefits the Sioux relinquished all claims or rights in lands outside the "Great Reservation."

In subsequent years the Sioux territory was diminished by other agreements. Ultimately, separate Indian reservations for various bands of Sioux were permanently fixed by the Act of 1889. This Act formally established the Pine Ridge Reservation for the Oglala Sioux.[5]

3. 25 U.S.C.A. § 311 provides:
"The Secretary of the Interior is authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways * * * through any Indian reservation or through any lands which have been allotted in severalty to any individual Indian under any laws or treaties but which have not been conveyed to the allottee with full power of alienation."
25 U.S.C.A. § 357 provides:
"Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee."

4. In addition to the Sioux, other parties to the treaty were the Crows, Cheyennes, Arrapahoes, "Assinaboines," Mandans, Gros Ventres and Arickarees.

5. Until 1871, Indian tribes were recognized as nations and treaties were made with them. By the Act of March 3, 1871 c. 120, § 1, 16 Stat. 566, Congress asserted legislative power over Indian affairs. The pertinent portion of the Act is now codified in 25 U.S.C.A. § 71 and provides:
"No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with

As an introduction to the specific contentions of appellant we recognize general rules of law which guide us in determining the merits of its claims. With respect to land agreements between the Indians and the United States, it has frequently been stated that the fee to the lands is vested in the federal government, and that "Indian title" represents merely a right to occupancy of the land, until such right has been surrendered to the federal government. As a general rule, Indian lands are not included in the term "public lands" which are subject to sale or disposal under general laws. Cf. Missouri-Kansas-Texas Railway Co. v. United States, 235 U.S. 37, 35 S.Ct. 6, 59 L.Ed. 116 (1914); Nor. Pac. Ry. Co. v. United States, 227 U.S. 355, 33 S.Ct. 368, 57 L.Ed. 544 (1913); Putnam v. United States, 248 F.2d 292 (8th Cir. 1957); 27 Am.Jur. Indians § 24, p. 557.

The federal government possesses the unquestioned power to convey the fee to lands occupied by Indian tribes, although the grantee takes only the naked fee and cannot disturb the occupancy of the Indians. Cf. United States v. Thomas, 151 U.S. 577, 14 S.Ct. 426, 38 L.Ed. 276 (1894); State of Wisconsin v. Hitchcock, 201 U.S. 202, 26 S.Ct. 498, 50 L.Ed. 727 (1906). The power of the United States to control the affairs of its Indian wards is subject to constitutional limitations and does not enable the United States, without paying just compensation, to appropriate lands of an Indian tribe. United States v. Klamath and Moadoc Tribes, 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); 27 Am.Jur. Indians § 37. A formal act of cession by a tribe, by treaty or otherwise, operates to determine the Indian title, and is the usual method in which such rights have been extinguished. 27 Am. Jur. Indians § 33.

In determining whether or not an Indian tribe has a compensable interest in lands, two types of title interest have been recognized. They are: "recognized title" (by treaty, statute or otherwise), and Indian or "aboriginal title," (continual occupancy and use to the exclusion of other tribes or persons.) For discussion of compensable Indian title, see Sac and Fox Tribes of Indians of Oklahoma v. United States (1963) 315 F.2d 896, 161 Ct.Cl. 189, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165; Minnesota Chippewa Tribe v. United States (1963) 315 F.2d 906, 161 Ct.Cl. 258.

All questions with respect to rights of occupancy in land, the manner, time and conditions of extinguishment of Indian title are solely for consideration of the federal government. Cf. United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260, rehear. denied, 314 U.S. 716, 62 S.Ct. 476, 86 L.Ed. 570 (1941); 27 Am.Jur. Indians § 33. As a corollary to this proposition, it follows that third parties, and in particular states and municipalities, acquire only such rights and interests in Indian lands as may be specifically granted to them by the federal government.[6]

To assure the utmost fairness in transactions between the United States and its Indian wards, any intent to deprive Indian tribes of their rights in land, or otherwise bring about the extinguishment of Indian title, either by grants in abrogation of existing treaties

any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired."

6. By Act of February 22, 1889, North Dakota, South Dakota, Montana and Washington were admitted as states. 25 Stat. 676. Among other provisions the people of the new states agreed that:
   "* * * they forever disclaim all right and title to the unappropriated public lands lying within the boundaries (of the new states), and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; * * *." Sec. 4, 25 Stat. 676 at p. 677.

or through other Congressional legislation must be clearly and unequivocally stated and language appearing in such grants and statutes is not to be construed to the prejudice of the Indians. See United States v. Santa Fe Pacific R. Co., supra, 314 U.S. at 353–356, 62 S.Ct. 248; Nor. Pac. Ry. Co. v. United States, supra; Leavenworth, etc. R. R. Co. v. United States, 92 U.S. 733, 23 L.Ed. 634 (1875); United States v. Shoshone Tribe, etc., 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938).

With the foregoing general principles in mind, we turn to appellant's theory that Congress has specifically granted easements for highway purposes over the land in question, and that Indian occupancy is subservient to these easements.

A. *The "Highway Act of 1866."*

Appellant asserts that prior to 1866, the land in question was a part of the public domain, and that the Sioux tribe had no title or reservation interest until the Treaty of 1868, creating the "Great Reservation." In this argument, appellant relies upon Section 8 of the Act of July 26, 1866, supra, which provides in pertinent part:

"The right of way for the construction of highways over *public lands,* not reserved for public uses, is hereby granted." (Emphasis supplied.) 43 U.S.C.A. § 932.

Appellant argues that this constituted an open offer for the taking of an easement by a public municipality, which was accepted by Bennett County upon construction of the road in question.

▇▇▇ In contrast the government asserts that the Treaty of Fort Laramie in 1851 constituted an inherent recognition of Indian title; that although the Treaty contains no technical language creating a formal "Reservation," the land was nonetheless effectively reserved for the use of the tribes, and thus, when the

"Highway Act" was passed, the lands were no longer "public lands, not reserved for public uses." In short, the grant of an easement over public lands found in the Act would not be applicable to Sioux lands set apart in the Treaty of 1851.

The circumstances surrounding the Treaty of 1851 have been fully delineated by the Court of Claims in Crow Tribe of Indians v. United States (Ct.Cl.1960) 284 F.2d 361, cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383. In determining that the Crows had a compensable interest in land described as their territory in the Fort Laramie Treaty, the Court concluded that this treaty was a recognition of Indian title by the United States, stating *inter alia:*

"It is true that the language of the Treaty is not the technical language of recognition of title. Nevertheless, we think that the participation of the United States in a treaty wherein the various Indian tribes describe and recognize each others' territories is, under the circumstances surrounding this treaty, and in light of one of the overriding purposes to be served by the treaty, i. e., securing free passage for emigrants across the Indians' lands by making particular tribes responsible for the maintenance of order in their particular areas, a recognition by the United States of the Indians' title to the areas for which they are to be held responsible, and which are described as 'their respective territories'." 284 F.2d at 364.

The Court distinguished United States v. Northern Pacific Ry. Co., 311 U.S. 317, 349, 61 S.Ct. 264, 85 L.Ed. 210 (1940), which had held that the Treaty of 1851 did not establish a *reservation* for the Indians.[7] In concluding that Northern Pacific was not controlling, the Court of Claims reviewed Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 65 S.Ct. 690, 89

7. In Northern Pacific, supra, the issue before the Court concerned railroad grants, limited to lands to which the Unit- ed States had full title, not reserved or otherwise appropriated.

L.Ed. 985 (1945), which by implication approved prior decisions of the Court of Claims holding that the Treaty of Fort Laramie was a recognition of Indian title. See, e. g., Fort Berthold Indians v. United States, 71 Ct.Cl. 308 (1930); Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347 (1933), cert. denied, 292 U.S. 606, 54 S.Ct. 772, 78 L.Ed. 1467; Crow Nation v. United States, 81 Ct.Cl. 238 (1935). In the Shoshone Indians case the Supreme Court determined that the "Box Elder Treaty" of 1863 did not recognize Indian title. In so holding, it distinguished the 1851 Treaty of Fort Laramie in the following language:

"* * * the circumstances surrounding the execution of the Fort Laramie treaty indicate a purpose to recognize the Indian title to the lands described in the Fort Laramie treaty, which may well have induced the Court of Claims to reach one conclusion in those cases *(Fort Berthold, Assiniboine* and *Crow Nation)* and another in this. * * *

"Furthermore, the words of the Fort Laramie treaty are more apt to express recognition of Indian title than those of Box Elder." 324 U.S. at 349–350, 65 S.Ct. at 697.

Agreements between the United States and the Sioux subsequent to the Treaty of Fort Laramie reinforce the conclusion that the treaty of 1851 was a recognition of Indian title. Cf. *Shoshone Indians,* supra, 324 U.S. at 346, 65 S.Ct. 690. In the Treaty of 1868, supra, 15 Stat. 635, which created the formal "Great Reservation," the Sioux agreed to "relinquish all claims or right in and to any portion of the United States * * * except such as is embraced within the (Reservation)." Article XVI of the Treaty provided explicitly:

"The United States hereby agrees and stipulates that the country north of the North Platte river and east of the summits of the Big Horn mountains shall be held and considered to be *unceded Indian territory,* and also stipulates and agrees that no white person or persons shall be permitted to settle upon or occupy any portion of the same; or without the consent of the Indians, first had and obtained, to pass through the same, * * *." 15 Stat. p. 640. (Emphasis supplied.)

When the Black Hills territory was ceded in an agreement ratified in 1877, 19 Stat. Chap. 72, p. 254, the following language appeared:

"* * * the said Indians do hereby relinquish and cede to the United States all the territory lying outside the said reservation, as herein modified and described, including all privileges of hunting * * *." Art. 1, p. 255.

In view of the language of the Treaty of 1851, the circumstances surrounding its signing, as set forth in Crow Tribe of Indians v. United States, supra, 284 F.2d at 364–367, and the nature of subsequent agreements between the United States and the Sioux, as exemplified by the agreements of 1868, 1877 and 1889,[8] we conclude that the land in question did not constitute a part of the public domain, subject to appropriation for highway purposes under the provisions of the "Highway Act" of 1866. Cf. Leavenworth, etc. R. R. Co. v. United States, supra, holding that a grant of public lands for railroad purposes does not apply to lands set aside for Indian occupancy pursuant to treaty.

B. *Act of 1889, 25 Stat. p. 888.*

■ Alternatively, the County insists that under the provisions of Section 21 of the Act of 1889 it has authority to construct a public highway along section lines of allotted Indian land, without per-

8. See discussion of Act of 1889, infra.

mission from the Secretary of Interior under § 311 or acquisition by condemnation under § 357.

This statute must be considered in light of the provisions of the Treaty of 1868, for the 1889 Act was designed to effect a further diminution of the Great Reservation created in 1868.[9] By description, portions of the "Great Reservation" were set off as separate reservations for various bands of the Sioux, including the Pine Ridge Reservation for the Oglalas. Provision was made for future allotment of tracts to individual members of the tribe. Prior allotments under the 1868 Treaty were protected, even though made outside the confines of the new reservations. Section 19 continued in effect provisions of the Treaty of 1868 and the Agreement of 1877 which were not in conflict with the new Act.

Section 21, of import here, provides:

"That all the lands in the Great Sioux Reservation outside of the separate reservations herein described *are hereby restored to the public domain,* except American Island, Farm Island and Niobrara Island * * *." (Emphasis supplied.)

This section further declared that *this* land was to be available to homesteaders at certain specified rates per acre, and that the government would purchase all land not disposed of at the end of ten years at the rate of $0.50 per acre. Proceeds from sales of land were to become a part of a permanent tribal fund. Appellant premises its right to enter the land in question on the portion of Section 21 which then followed:

"*Provided,* that there shall be reserved public highways four rods wide around every section of land allotted, or opened to settlement by this act,

the section lines being the center of said highways; but no deduction shall be made in the amount to be paid for each quarter-section of land by reason of such reservation. * * *."

By reason of this language, the County asserts that lands allotted severally to tribal members within the reservation are subject to the highway easement.

We do not agree. In our view the phrase "around every section of land allotted" is somewhat ambiguous. Considered out of context, it would seem to refer to Indian tribal allotments. Construing Section 21 as a whole, however, the language relied upon by the County appears solely in a proviso modifying the dominant provisions of that section. Our analysis of Section 21 in its entirety leads us to conclude it is applicable only to those lands *outside* the separate reservations, that is, to those lands "restored to the public domain." That section deals at length with these public lands and established the prices to be paid by homesteaders and the United States for the benefit of the tribes.

Upon examining other sections of the Act of 1889, we are persuaded to believe that Congress intended not only that the Sioux be compensated for land *ceded* back to the public domain but also intended that they be compensated for any land appropriation *within* the new reservations. For instance, Section 18 provided that if any land within the newly created reservations was occupied by religious societies, these societies could continue to use the land, "with the approval of the Secretary," and could *purchase* additional land upon agreement with the Secretary. Section 12 provided that the Secretary of Interior could purchase such unneeded land within the reservation as the Indians would consent to sell.[10]

9. The Act of 1889 was entitled "An act to divide a portion of the reservation of the Sioux Nation of Indians in Dakota into separate reservations and to secure the relinquishment of the Indian title to the remainder, and for other purposes."

10. Section 12 provides:
"That at any time after lands have been allotted to all the Indians of any tribe as herein provided * * * it shall be lawful for the Secretary of the Interior to negotiate with such Indian

Section 16 confirmed a grant of rights of way for railroad purposes, subject again to approval of the Secretary of Interior and payment of compensation.[11]

In Section 24 certain sections "of the lands open[ed] to settlement" (the ceded lands) were reserved for the benefit of public schools within the Territory, and were not subject to entry under the homestead laws. The United States agreed to pay the Indians $1.25 per acre for all lands reserved for these school sites.

Also of significance is the clause immediately following the imposition of the highway easement in the Section 21 proviso relied upon by the County. It provides that "no deduction shall be made in the amount to be paid for each quarter-section of land by reason of such reservation * * *." The effect of this clause is to impose a servitude upon the homestead tract for highway purposes, but to insure that payments due the Sioux for the ceded land, that is, land returned to public domain, would not be reduced. These sundry provisions of the Act of 1889 reinforce our conclusion that the easement proviso of Section 21 of that Act applies only to lands open to settlement (for which payment is to be made). It is inconceivable that Congress would thus carefully assure to the Sioux payment for an easement within the ceded territory, and at the same time impose a servitude for a highway easement upon

lands *within* the new reservation without also providing compensation.

Appellant's construction, moreover, would appear to be contrary to the express language of Section 16 of the Act, which confirms in the Indians "to their separate and exclusive use and benefit, all the title and interest of every name and nature secured therein to the different bands of the Sioux Nation by said Treaty of [1868]." [12]

We have discussed the various provisions of the Act of 1889 for the purpose of indicating its scope and effect. It seems clear that the federal government was careful to protect Indian rights both within and without the new reservations, providing compensation for all lands ceded and returned to the public domain as well as compensation for any use or appropriation within the reservations. Without a more clearly expressed provision, we cannot believe that Congress intended to impose a servitude upon land within the reservations without requiring the consent of the tribe or Secretary, and without payment of compensation for the taking.

We affirm the finding of the district court that Bennett County's right to enter the land in question is contingent upon the permission of the Secretary under Section 311, or a right obtained through lawful condemnation proceedings under Section 357. These sections are a part of the definitive and extensive

tribe for the purchase and release by said tribe * * * of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress."

11. Congress has from time to time granted rights of way across Indian reservations to railroad companies, but has made these grants subject to the consent of the Indians and payment of compensation. An

example may be found in the Act of February 23, 1889, Ch. 202, 25 Stat. 684, granting a right of way through the Yankton Indian Reservation in Dakota Territory. See also 25 U.S.C.A. § 341 (1887).

12. In the Treaty of 1868, supra, 15 Stat. at p. 639, the Sioux agreed not to object to future construction of railroads, wagon roads, or other works of public necessity, but in turn, the government agreed to pay damages and compensation should such work be authorized or permitted by the laws of the United States.

legislation which has been evolved by Congress over the years in discharge of its duties toward its Indian wards.[13]

The judgment is affirmed.

---

13. Other protective sections codified in Title 25 are the following:

§ 179—prohibiting the driving of stock over Indian lands without consent;

§ 180—prohibiting surveying or settling upon Indian lands;

§§ 312 and 314—providing for rights of way for railway, telegraph and telephone lines, upon consent of the Secretary and upon payment of compensation;

§ 319—authorizing the Secretary to grant easements for telephone and telegraph lines over tribal and restricted Indian lands, upon payment of just compensation;

§ 321—authorizing the Secretary to grant pipeline easements through restricted Indian lands, upon payment of just compensation;

§§ 323–325—empowering the Secretary to grant rights of way for "all purposes" across Indian lands, but only with consent of the Indians and upon payment of just compensation;

§ 341—affirming the power of Congress to grant a right of way through Indian lands for railroads, highways and telegraph lines, or to condemn such lands for public uses, "upon making just compensation."