## SAWYER v. OSTERHAUS et al.

### (District Court, N. D. California, Second Division. February 7, 1914.)

### No. 15,069.

1. EJECTMENT (§ 9*)—TITLE TO SUPPORT ACTION.

    In ejectment, plaintiff must recover on the strength of his own title, regardless of the weakness of his adversary's title, and must show a legal title as distinguished from a mere equity.

    [Ed. Note.—For other cases, see Ejectment, Cent. Dig. §§ 16–29; Dec. Dig. § 9.*]

2. PUBLIC LANDS (§ 58*)—SWAMP LAND ACT—PASSING OF TITLE TO STATE.

    While Swamp Land Act Sept. 28, 1850, c. 84, 9 Stat. 520 (U. S. Comp. St. 1901, p. 1586), was by its terms a grant in præsenti, the legal title to the lands granted thereby vests in the state only upon definite identification of the lands to which it attached in the manner provided in the act, and, until the ascertainment of that fact, and the issuance of a patent as provided in section 2, the legal title remains in the government, and that of the state is merely inchoate.

    [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 180–183, 187–191; Dec. Dig. § 58.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. PUBLIC LANDS (§ 61*)—CLAIMANT UNDER SWAMP LAND GRANT.
   Where no steps have been taken, either by the land department or by a state, to have a tract of land identified and patented to the state under Swamp Land Act Sept. 28, 1850, c. 84, 9 Stat. 520 (U. S. Comp. St. 1901, p. 1586), a plaintiff in ejectment, claiming through a conveyance from the state, but who has never been in possession, cannot sustain his title under that grant by parol evidence to show that the land was in fact swamp and overflowed land at the date of the passage of the act.

   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 192–213; Dec. Dig. § 61.*]

4. PUBLIC LANDS (§ 59*)—LANDS INCLUDED IN SWAMP LAND GRANT—"TIDE LANDS"—"SWAMP LANDS."
   Lands which are wholly subject to the tidal action of the waters of a bay, tributary to the sea, which overflow them at high tide, cannot be classed as "swamp lands" under Swamp Land Act Sept. 28, 1850, c. 84, 9 Stat. 520 (U. S. Comp. St. 1901, p. 1586), but are "tide lands."

   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 184, 185; Dec. Dig. § 59.*

   For other definitions, see Words and Phrases, vol. 8, pp. 6836, 6970.]

5. PUBLIC LANDS (§ 58*)—DEVOTION TO PUBLIC USE—EFFECT OF PRIOR GRANT.
   Notwithstanding a grant to a state of public lands under a generic description, but dependent upon ascertainment and definition by survey or patent to pass the legal title, until such title is vested in the state, the United States retains full and complete power to devote any portion of such lands to any necessary public purpose, leaving the state to be indemnified for the loss in such manner as Congress may have provided.

   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 180–183, 187–191; Dec. Dig. § 58.*]

At Law. Action by E. H. Sawyer against Hugo Osterhaus and Henry T. Mayo. Trial to court, and judgment for defendants.
See, also, 195 Fed. 655.

This is an action of ejectment to recover the possession of a tract of land in the county of Solano in this state. The land is physically a part of the body of land officially known and designated as "Mare Island," now, and for many years, a government reservation as a naval station, which lies in a northerly arm of the bay of San Francisco technically known as San Pablo Bay. Historically speaking, and as depicted upon the maps of the state, Mare Island was apparently at one time a territory comprising several thousand acres. As thus shown, its southerly projection, resting in San Pablo Bay, consists of a compact body of high land, bearing a general resemblance to the low hill or rolling land found upon the adjacent mainland, from which higher part or head there extends to the northwest a low, narrow neck or strip connecting it with a much larger body of low, swampy land, spreading out fanlike for several miles in the same general direction. This body of land, as thus described, was bounded by San Pablo Bay on the south and west, by Mare Island Straits and Napa Bay on the east, and Sonoma creek on the north—all navigable. At the date of the reservation of the island as a naval base, this entire territory was supposed to be embraced within its limits, and the evidence tends to show that during the early years of its occupancy steps were taken by the government authorities looking to the assertion of dominion over the whole of this area for such purpose. Subsequently, however, an action was brought in the Circuit Court for this district by a private party against the then commandant of the navy yard for the recovery of the possession of the larger tract of lowland above described, the plaintiff claiming title from the state under the Swamp Land Act, so-called, of September 28, 1850 (9 Stat. 519, c. 84) and in this action the plaintiff prevailed, the court holding that the land claimed was swamp and overflowed land passing to the state under that act, and was not a part of

the island proper, nor included within the naval reservation. San Francisco Savings Union v. Irwin (C. C.) 28 Fed. 708. The area thus lost to the government embraced some 7,000 acres, more or less, and was included within what was designated as swamp and overflowed land survey No. 569.

The tract involved in the present controversy is all of the land embraced in the long, narrow neck above referred to, running from the northerly limits of the high land of the island to the southern boundary of swamp and overflowed land survey No. 569, just referred to, being bounded on the west by San Pablo Bay and on the east by Mare Island Straits, comprising 164.55 acres. It is referred to in the complaint as being the same land embraced in swamp and overflowed land survey No. 34 of Solano county, and is sometimes called the "Darlington Tract."

At the time of the commencement of the action the defendant Osterhaus, a Rear Admiral in the United States navy, was in possession of the premises in his official capacity as commandant of the Mare Island Navy Yard, and claimed the right of possession only by virtue and by reason of his authority as such commandant, and as representing the rights of the United States. Thereafter this defendant was superseded as such commandant by Henry T. Mayo, then a captain in the navy, who took possession with like authority and for the same purposes as his predecessor, and, this fact being suggested to the court, the latter was brought in as a defendant, and was yet in such possession at the trial and submission of the cause.

Prior to the general appearance for the defendant, the United States attorney appeared specially and filed a suggestion of the Attorney General of a want of jurisdiction in the court on the ground that the real defendant in interest was the United States, and the nominal defendant but its officer or agent, holding in its name and right, and upon this ground moved that the action be dismissed for the reason that the United States may not be sued without permission of Congress. This motion was denied (Sawyer v. Osterhaus [D. C.] 195 Fed. 655), and thereafter the cause came to issue and was tried to the court, a jury being waived.

The complaint is in the usual form, alleging that the plaintiff is the owner and seised in fee of the premises, and that defendant is in possession, and excluded plaintiff therefrom. The answer admits defendant's possession— in the capacity and for the purposes above stated—denies plaintiff's ownership, and sets up: (1) Title in the United States; (2) that the action is barred by the statute of limitations; and (3) an estoppel in pais.

Plaintiff's asserted title to the premises in dispute is founded upon the claim that the tract was swamp and overflowed land at the date of the passage of the Swamp Land Act of 1850, above adverted to, which passed to the state under that act, and the subsequent acquisition of the title of the state under proceedings had in conformity with an act of the Legislature of the state providing for the sale of such lands, approved April 28, 1855 (St. Cal. 1855, p. 189). To sustain this claim plaintiff introduced evidence of a survey of the tract designated as swamp and overflowed land survey No. 34, and other steps required by the last-mentioned act, culminating in a patent from the state to one David N. Darlington, bearing date March 18, 1857, followed by sundry mesne conveyances, vesting in plaintiff any title carried by that patent. When the patent was offered in evidence it was objected to by defendant on the ground, among others, that it does not appear that the state had title to the land at the date of the patent; that there is no evidence that the United States ever in any way recognized the land as swamp and overflowed, or that the Secretary of the Interior has ever segregated or listed the land to the state, as required by section 2 of the Swamp Land Act, or that a patent has ever issued therefor from the United States to the state, as provided by that act. In response to this objection, while admitting there has never been an identification of the character of the land, or any listing thereof by the Secretary of the Interior, or a patent to the state from the government, plaintiff offered parol evidence to show that at the date of the Swamp Land Act the land was in fact of the character granted by that act. This parol evidence was objected to as incompetent to establish the fact, but it was tentatively admitted, subject to the objection, and was put in, with the result to be hereinafter noted.

In response to plaintiff's case the defendant introduced evidence which, together with the treaty with Mexico, acts of Congress, and public acts of the Chief Executive, of which the court takes judicial cognizance, shows these facts: That by the Treaty of Guadalupe Hidalgo in 1848 Mexico granted to the United States all the land in the present state of California not theretofore granted in private ownership; that prior thereto in 1841 title to the body of land known as Mare Island was granted by the Mexican government to Victor Castro, and thereafter, through mesne conveyances, became vested in William H. Aspinwall and George W. P. Bissell, in whom it was thereafter, on May 8, 1852, confirmed by a decree of the United States Land Commission for the settlement of land titles in California, the premises being thus described: "The place of which confirmation is hereby given is situated in the bay of San Francisco and is called the 'Isla de la Yegua,' or 'Mare Island,' and, being an island, is bounded by the water's edge." That on December 2, 1851, President Fillmore in his Second Annual Message to Congress (volume 5, Messages and Papers of the Presidents, pp. 113, 133) made a recommendation that a navy yard be established on the bay of San Francisco; thereafter Congress, in section 3 of "An Act making appropriations for the naval service for the year ending June 3, 1853," approved August 31, 1852 (chapter 109, 10 Stat. 100), made an appropriation for such purpose, and authorized its location and survey by the Secretary of the Navy; and a board of location and survey was appointed, who in due time made a survey and report. On January 4, 1853, Aspinwall and Bissell conveyed the land known as Mare Island to the United States, the conveyance describing it as: "All that tract of land called and known as 'Mare Island,' in the bay of San Pablo, as recently surveyed by the board of officers of the United States sent to California for the selection of a site for the navy yard there, including all the tule or low and marsh land belonging to the same, or which has ever been reputed or claimed to belong to the same." Thereafter, on February 11, 1853, the President made an executive order that Mare Island, "together with all its appendages of tule or marsh lands belonging to said island, and the harbors, waters, and anchorages," etc., be reserved for public uses as a navy yard.

The evidence further shows that immediately upon, or soon after, its reservation as a naval station the United States government took possession of Mare Island, including the premises in dispute, established an extensive navy yard, with shops, docks, and other works connected therewith, and has maintained such possession unbrokenly down to the present time for use as a naval station, to the exclusion of all other occupancy thereof, the buildings and other main structures being maintained at the southern end of the island on the higher ground above referred to, while the land in dispute has been used for dumpage, storage, and like purposes, with a railway running from the main yard out to the dumps; that levees have been constructed to keep back the flow of tide waters; that the land has been partially filled in and reclaimed by dredging from Mare Island Straits; that roads are maintained thereon; that a line of dolphins on the eastern side is established for anchorage purposes in Mare Island Straits, and sentries are maintained on the land to protect the premises from intrusion and the property of the government from being stolen or carried away.

The defendant also introduced evidence in support of the special defenses set up, which may be considered in connection with the subject-matter of those defenses if it be deemed necessary to notice them.

Frank R. Devlin, of Vallejo, and M. W. McIntosh, of San Francisco, for plaintiff.

Robert T. Devlin, John L. McNab, John W. Preston, U. S. Atty., and Earl H. Pier, Asst. U. S. Atty., all of San Francisco, Cal., for defendants.

VAN FLEET, District Judge (after stating the facts as above). [1] Upon the facts several obstacles present themselves as standing

in the way of a recovery by the plaintiff. His whole case, as indicated, rests primarily upon the construction and effect of the Swamp Land Act, which is the essential basis of his title, if he have any. The action being in ejectment, the first inquiry is whether plaintiff has shown legal title to the premises involved, since he must recover, if at all, upon the strength of his own title, regardless of the weakness of that of his adversary (Christy v. Scott, 14 How. (U. S.) 282, 14 L Ed. 422; Fussel v. Gregg, 113 U. S. 550, 5 Sup. Ct. 631, 28 L. Ed. 993; McGuire v. Blount, 199 U. S. 144, 26 Sup. Ct. 1, 50 L. Ed. 125), and it must be a legal title as distinguished from a mere equity (McCormick v. Hayes, 159 U. S. 332, 339, 16 Sup. Ct. 37, 40 L. Ed. 171).

[2] The plaintiff's theory is that the Swamp Land Act was an absolute grant in præsenti, vesting at once in the state, and subject to its immediate disposition, legal title to all the lands falling within the class therein described, dependent only on their identification as such and without the necessity of a patent from the United States to the state; that this identification, if not had through the Secretary of the Interior and the formal issuance of a patent to the state, as provided by section 2 of the act, may be shown by one holding evidence of title under the state through the introduction of parol evidence establishing the character of the land as swamp and overflowed at the date of the taking effect of the act; and, upon that fact being shown, a perfect legal title is made out upon which ejectment may be maintained.

I am of opinion that neither proposition involved in this contention can be sustained. While the construction thus claimed for the granting clause of the act finds countenance in an early opinion of the Attorney General (9 Opinions, Attys. Gen. 254), and in cases from the Supreme Court of California, and while there is some language tending more or less directly to support it in Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985, 30 L. Ed. 1039, and in San Francisco Savings Union v. Irwin, supra, which followed it, it must now be regarded as definitely settled by the later cases from the Supreme Court that, while concededly the act was by its terms a grant in præsenti, the legal title to the lands granted thereby vests in the state only upon definite identification of the lands to which it attached in the manner provided in the act, and that, until the ascertainment of that fact and the issuance of patent, the legal title remains in the government, and that of the state is merely inchoate. Rogers' Locomotive Works v. Emigrant Co., 164 U. S. 568, 17 Sup. Ct. 188, 41 L. Ed. 552; Michigan Land, etc., Co. v. Rust, 168 U. S. 589, 18 Sup. Ct. 208, 42 L. Ed. 591; Brown v. Hitchcock, 173 U. S. 476, 19 Sup. Ct. 485, 43 L. Ed. 772; United States v. Chicago, etc., Ry. Co., 218 U. S. 242, 31 Sup. Ct. 7, 54 L. Ed. 1015; McCormick v. Hayes, 159 U. S. 338, 16 Sup. Ct. 37, 40 L. Ed. 171; Chapman & Dewey Lumber Co. v. St. Francis Levee District, 232 U. S. 186, 34 Sup. Ct. 297, 58 L. Ed. ——, decided January 26, 1914.

Thus in Rogers v. Emigrant Co., after a full review of the authorities, it is said:

"While, therefore, as held in many cases, the act of 1850 was in præsenti, and gave an inchoate title, the lands needed to be identified as lands that passed under the act; which being done, and not before, the title became per-

fect as of the date of the granting act. Wright v. Roseberry, 121 U. S. 488, 494 [7 Sup. Ct. 985, 30 L. Ed. 1039] et seq.; Tubbs v. Wilhoit, 138 U. S. 134, 137 [11 Sup. Ct. 279, 34 L. Ed. 887]; Chandler v Calumet & Hecla Mining Co., 149 U. S. 79, 91 [13 Sup. Ct. 798, 37 L. Ed. 657]."

In Brown v. Hitchcock the question is put in these plain and unequivocal terms:

"Under the Swamp Land Act the legal title passes only on delivery of the patent. So the statute in terms declares. The second section provides that the Secretary of the Interior, 'at the request of said Governor' [the Governor of the state], shall 'cause a patent to be issued to the state therefor; and on that patent the fee simple to said lands shall vest in the said state.' "—citing cases.

"In this case the record discloses no patent, and therefore no passing of the legal title. Whatever equitable rights or title may have vested in the state, the legal title remained in the United States."

And again in Michigan Land Co. v. Rust:

"It will be perceived that the act contemplated the issue of a patent as the means of transferring the legal title. In Rogers' Locomotive Works v. Emigrant Co., 164 U. S. 559, 574 [17 Sup. Ct. 188, 192 (41 L. Ed. 552)] it was said, speaking in reference to this matter, and after a full review of the previous authorities: 'When he [that is, the Secretary of the Interior] made such identification, then, and not before, the state was entitled to a patent, and "on such patent" the fee-simple title vested in the state. The state's title was at the outset an inchoate one, and did not become perfect, as of the date of the act, until a patent was issued.' "

Logically, the principles there announced would end plaintiff's case at the threshold, it being conceded that in this instance no patent has ever passed from the United States to the state for this land, and as a consequence the legal title still remains in the United States.

[3] Plaintiff very strenuously contends however that in Railroad Co. v. Smith, 76 U. S. (9 Wall.) 95, 19 L. Ed. 599, and in Wright v. Roseberry, recognition was given to the title of the state or its grantee to such lands in the absence of a patent or of any formal identification or listing by the Secretary of the Interior, and countenanced a resort to parol evidence to establish the character of the land, and that the doctrine of those cases has application in the present case. But a careful consideration of the real questions involved in those cases will, I think, show clearly that they lend no substantial support to this claim.

Railroad Co. v. Smith was one of two companion cases, decided at the same term, the other being Railroad Co. v. Fremont County, 9 Wall. 89, 19 L. Ed. 563, immediately preceding the report of the Smith Case. As several references are made in the latter to the Fremont Case, it will be well to briefly state the facts of that case in order that such references may be more clearly appreciated. In the Fremont Case the county was the complainant in the court below, suing the railroad company to quiet its title to a large body of land which it claimed to have acquired from the state (Iowa) under the Swamp Land Act, and to which the railroad company laid claim under an act making a grant of a later date to the state in aid of the construction of railroads. Under neither grant had patent formally passed to the state from the United States, but it appeared that under the Swamp Land Grant the

lands had been definitely identified and listed to the state by or under the authority of the Secretary of the Interior, at a date prior to the definite location of the line of the defendant's road; and, as the railroad grant attached only on definite location of its line, and excepted from its operation any lands granted or appropriated to any other purpose prior to its taking effect, it was held that the title of the county, under the evidence adduced, must prevail.

In the Smith Case the controversy was again between rival claimants under the Swamp Land Act and a railroad grant, respectively. The railroad company was the plaintiff, and claimed under an act of Congress making a grant to the state of Missouri in aid of the railroad. This grant the state had accepted, and by statute had sought to vest the title in the railroad. The defendant Smith was in possession, claiming title through the state under the Swamp Land Act. As in the present case, it was conceded that no patent had issued to the state under that act, and that the Secretary of the Interior had not certified the lands as within the act; the evidence tending to show that that official, having no sufficient evidence to enable him to make such certificate, had refused it. Under these circumstances the defendant, in defense of his possession and claim of title, and to show that the land was not included in the terms of the railroad grant, was permitted, against objection, to put in parol evidence tending to establish that, at the date of the Swamp Land Act, the lands in suit were wet and unfit for cultivation. In passing upon the case, and distinguishing it from the Fremont Case, the court say:

"In that case the county of Fremont, claiming under the swamp land grant, was plaintiff, and the railroad company, claiming under the grant to the state for railroads, was defendant, and the main point in it related to the evidence which might be necessary to establish the fact that the lands claimed by plaintiff were swamp and overflowed within the meaning of the act of 1850. In the present case the position of the parties is reversed, the plaintiff claiming under the act of June 10, 1852, granting lands to the state of Missouri for railroad purposes, and the defendant claiming under the swamp land grant. In the former case it was necessary for the plaintiff, who must succeed on the strength of her own title, to show satisfactory evidence that the title of the United States had, under the swamp land grant, become vested in Fremont county. The opinion of the court shows how this was successfully done in that case. In the present action it was incumbent on the railroad company to show that the title of the United States had become vested in the company under the grant for railroad purposes. It is admitted that this has been done, unless the land is of that class reserved from the grant as swamp land; for the act under which plaintiff claims has an exception in precisely the same terms with the act for the benefit of the Iowa railroads. In the former case the plaintiff, claiming under the swamp land grant, was bound to establish his title by such evidence as Congress may have determined to be necessary to make the title complete in the state, or the grantee of the state, to which the lands were supposed to be granted, otherwise the plaintiff established no legal title. In the present case it is not necessary to defeat the title under the railroad grant to show that all the steps prescribed by Congress to vest a complete title in defendant, under the swamp land grant, have been taken. It is sufficient to show that this land which is now claimed under the railroad grant, was reserved out of that grant, and this is done whenever it is proved by appropriate testimony to have been swamp and overflowed land, as described in the act of 1850."

And after a discussion of the question of the admissibility, under the circumstances, of the evidence offered, and holding it proper for the purpose, the court say:

"Any other rule results in this: That because the Secretary of the Interior has failed to discharge his duty in certifying these lands to the states, they, therefore, pass under a grant from which they are excepted beyond doubt; and this, when it can be proved by testimony capable of producing the fullest conviction that they were of the class excluded from plaintiff's grant."

It will be at once perceived that that case furnishes no warrant for a resort to parol proof in aid of plaintiff's title in the present case. That case furnishes but an application of the familiar principle that an equitable right may be resorted to, in defense of the bald legal title, to show that the latter should not prevail. The difference is in the position of the parties. Were plaintiff in possession here, resisting an assault upon his claimed rights under the Swamp Land Act, the cases would be perhaps analogous. But, as aptly said of the railroad company in that case, the plaintiff is here "the *actor*, not as in the last one a defending party merely," and he is bound, in making out his claim of legal title, to establish it by "such evidence as Congress may have determined to be necessary to make the title complete in the state," that is, by showing an identification of the character of the land by the Secretary of the Interior, or by a patent to the state, or both. It may be added that there is nothing in the present case, as in Railroad Co. v. Smith, to show that any effort or demand has ever been made by plaintiff or his predecessors to have the Land Department certify the character of the land, or that it has ever refused, upon proper application, to do so.

But, moreover, the decision in the Smith Case was the occasion for a sharp and vigorous dissent, as a dangerous departure from the express requirements of the Swamp Land Act, and the doctrine has been refused extension beyond the special circumstances there involved. Thus in French v. Fyan, 93 U. S. 169, 23 L. Ed. 812, which, like the present, was an action of ejectment, where the plaintiff, claiming title under a railroad grant, having made out his prima facie case, the defendant showed title to the land from the state, to which it had previously been listed and patented as swamp and overflowed under the act of 1850. Thereupon the plaintiff, to avoid the effect of defendant's patent, sought, on the authority of Railroad Co. v. Smith, to show that the land was not in fact swamp and overflowed at the date of that act. The Supreme Court, in sustaining the ruling of the lower court, holding that the certification and patenting of the land as provided in section 2 of the Swamp Land Act was conclusive, say:

"It was under the power conferred by this section that the patent was issued under which defendant holds the land. We are of opinion that this section devolved upon the Secretary of the Interior, as the head of the department which administers the affairs of the public lands, the duty, and conferred on him the power, of determining what lands were of the description granted by that act, and made his office the tribunal whose decision on that subject was to be controlling. * * * The case of Railroad Co. v. Smith, 9 Wall. 95 [19 L. Ed. 599] is relied on as justifying the offer of parol testimony in the one before us. In that case it was held that parol evidence

was competent to prove that a particular piece of land was swamp land within the meaning of the act of Congress. But a careful examination will show that it was done with hesitation, and with some dissent in the court. The admission was placed expressly on the ground that the Secretary of the Interior had neglected or refused to do his duty; that he had made no selection or lists whatever, and would issue no patents, although many years had elapsed since the passage of the act."

Again, in Chandler v. Calumet & Hecla Mining Co., 149 U. S. 79, 13 Sup. Ct. 798, 37 L. Ed. 657, referring to the doctrine announced in the Smith Case, it is said:

"But aside from this, the rule as to oral evidence, recognized in that case, was afterwards explained, and limited in its operation to cases in which there had been nonaction or refusal to act on the part of the Secretary of the Interior in selecting lands granted, as appears in the subsequent cases of French x. Fyan, 93 U. S. 169, 173 [23 L. Ed. 812], and Ehrhardt v. Hogaboom, 115 U. S. 67, 69 [5 Sup. Ct. 1157, 29 L. Ed. 346], where parol evidence was offered to show that patented lands were not of the character described."

See, also, McCormick v. Hayes, supra; Rogers Locomotive Works v. Emigrant Co., supra; and United States v. Chicago, etc., Ry. Co., supra.

These considerations show very clearly that Railroad Co. v. Smith can have no proper application to the present case, where plaintiff is bound to establish a legal title as distinguished from a mere equitable claim.

As to Wright v. Roseberry, upon which plaintiff apparently places the greatest reliance for his contention, while there is some general language in the elaborate discussion there indulged in, tending to give support to plaintiff's view, a careful study of the case shows that what is there said as to the admissibility of parol evidence was without pertinency to the facts, and was simply arguendo, since the evidence showed that the land in controversy had been fully identified as swamp and overflowed land by a substitute method provided by Congress in an act specially intended to quiet land titles in California. The case, and the construction put upon it by the Supreme Court, is so aptly stated in the subsequent case of McCormick v. Hayes, 159 U. S. 339, 16 Sup. Ct. 39, 40 L. Ed. 171, that it will only be necessary to quote briefly from the latter to show that it is to be given no such effect as that contended for. The court first states the question involved before them thus:

"The controlling question, therefore, in this case, so far as the plaintiff is concerned—and he must recover upon the strength of his own title, even if that of the defendant be defective—is whether, under the circumstances disclosed by the record, the particular lands in controversy, in the absence of any selection and certification of them by the United States to the state, under the Swamp Land Act, can be shown by parol testimony to have been, in fact, at the date of that act, swamp and overflowed lands. Congress, having made it the duty of the Secretary of the Interior to make out accurate lists and plats of the lands embraced by the Swamp Land Act, and transmit the same to the Governor of the state, and at the request of the latter to cause a patent to be issued to the state therefor, and having provided that 'on that patent the fee simple to said lands shall vest in said state subject to the disposal of the Legislature thereof,' did the title vest in the state, by virtue alone, and immediately upon the passage of the act, without any selection by or under the direction of the Department of the Interior, so that

the state's grantees could maintain an action to recover the possession of them?"

And after a full discussion of the decided cases, and distinguishing the case of Railroad Co. v. Smith, and reaffirming the doctrine of French v. Fyan, it is said:

"It is supposed by counsel that these principles were modified in Wright v. Roseberry, 121 U. S. 488, 511, 512, 518 [7 Sup. Ct. 985, 30 L. Ed. 1039]. But such is not the fact. In that case the plaintiff sued to recover possession of a tract of land in California. He asserted title under that Swamp Land Act, claiming by conveyance from parties who had purchased from the state, the defendants, under patents of the United States issued under the pre-emption laws to them, or to parties from whom they derived their interest. The particular point to which the court directed its attention was whether an action could be maintained upon the title to swamp and overflowed lands *in California* until they had been certified as such pursuant to the fourth section of the act of Congress of July 23, 1866, entitled 'An act to quiet land titles in California.' In determining that question it became necessary to examine the course of legislation and of judicial decision under the Swamp Land Act of 1850. Referring to the act of July 23, 1866, 14 Stat. 218, c. 219, the *court said* that 'Congress changed the provisions of law for the identification of swamp and overflowed lands *in that state. It no longer left their identification to the Secretary of the Interior,* but provided for such identification by the joint action of the state and federal authorities.' * * * It appeared in proof that the lands there in controversy had been segregated as swamp and overflowed lands by the authorities of the state of California, that their designation as such lands on a plat of the township made by the surveyor general of the United States was approved by that officer, and forwarded to the General Land Office, pursuant to the act of 1866, and that such plat was approved by the Commissioner, as shown by its official use of it. 'The act of Congress,' the court said, 'intended that the segregation maps prepared by authority of the state, and filed in the state surveyor general's office, if found upon examination by the United States surveyor general to be made in accordance with the public surveys of the general government, should be taken as evidence that the lands designated thereon as swamp and overflowed were such in fact, except where this would interfere with previously acquired interests.' So far from modifying the rule announced in French v. Fyan, the court recognized the authority of that case, and distinguished it from the one then under consideration."

It should be stated that in the present case no claim was advanced that there had been a compliance with the act of 1866 referred to in the above case. It will thus be seen that there is nothing in Wright v. Roseberry, as supposed by plaintiff, justifying, in a case like the present, a resort to parol evidence to show the character of the land.

It may be added with reference to that case that the more closely it is read the more clearly it appears that it was really decided upon the theory that the effect of the Swamp Land Act was to vest complete legal title in the state as of its date immediately upon the identification of the land in some appropriate manner as being embraced in the grant, without the necessity of a patent from the United States; but, as we have seen, that theory or doctrine has since been repeatedly repudiated by the Supreme Court, and can no longer be regarded as obtaining.

So far as the case of San Francisco Savings Union v. Irwin is concerned in its effect upon this point, it was decided on circuit by the same distinguished jurist who wrote the opinion in Wright v. Roseberry, and very manifestly proceeded upon the same theory of the

act indicated by the opinion in that case. For the reasons already sufficiently given it cannot be regarded as authority upon the point under consideration.

It follows from what has been said that the parol evidence offered and conditionally received to show the character of the land in suit was inadmissible for the purpose, and may not competently be considered.

[4] It may be added, however, in this connection that if this evidence were admissible, I should be compelled to find against the plaintiff's contention as to its effect. In my judgment its tendency is to establish practically without controversy that the lands in suit were at the date in question, and continued to be down to a period long after their survey for plaintiff's predecessors, strictly within the definition of tide lands, as distinguished from swamp lands. I say this with due deference as to what was held as to the lands involved in San Francisco Savings Union v. Irwin. I cannot know what the evidence was in that case, but am circumscribed by what was shown in this; and, moreover, the respective situations of the tracts involved in the two cases are in some essential respects quite different, and especially as to the effect of the flow of the salt tides. The lands in the Savings Union Case were undoubtedly, from their situation, affected largely by fresh waters from the streams which partially surround them, while the present premises were, until leveed, wholly subject to the tidal action of the waters of the bay, which daily flowed over them back and forth between San Pablo Bay and Mare Island Straits, completely submerging them at its highest flood, and largely so at its ordinary stage. Lands so situated cannot be classed as swamp and overflowed; they are tidelands. Eichelberger v. Mills Land Co., 9 Cal. App. 639, 100 Pac. 117; Ward v. Mulford, 32 Cal. 365; People v. Morrill, 26 Cal. 354; and see the very full discussion of the subject in People v. California Fish Co., 138 Pac. 79, decided December 20, 1913, by the Supreme Court of California.

My conclusion is therefore that plaintiff has wholly failed to make out, as was incumbent upon him, a legal title to the premises in suit.

[5] But there is a further proposition arising, I think, upon the facts, which it seems to me would of itself preclude a recovery of the premises by plaintiff in this action, and upon which, but for the consideration that it was not urged upon the attention of the court, I should have felt strongly inclined to rest my decision. It appears that the reservation of Mare Island as a naval base was made by the President at a time when the legal title to the lands in dispute, whatever their character, was, as to the plaintiff at least, still in the United States, and indeed, as we have seen, still rests there; and this reservation was in terms sufficiently broad to include this land, and it was in fact taken possession of in pursuance thereof, and has been so held since. That the President had ample power to reserve and set aside any part of the public domain, whatever its character, for a purpose such as that involved, which is regarded as a paramount use, there can be no question. Grisar v. McDowell, 6 Wall. 363, 18 L. Ed. 863; Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264; Rus-

sian-American Trading Co. v. United States, 39 Ct. Cl. 460; s. c., 199 U. S. 570, 26 Sup. Ct. 157, 50 L. Ed. 314; volume 1, Land Dec. Dept. Int. page 702. Under these circumstances I am of opinion that the case falls within the principles recently applied here in Cobban v. Hyde, 212 Fed. 480, based upon Heydenfeldt v. Daney G. M. Co., 93 U. S. 634, 23 L. Ed. 995; Minnesota v. Hitchcock, 185 U. S. 373, 22 Sup. Ct. 650, 46 L. Ed. 954; Wisconsin v. Hitchcock, 201 U. S. 202, 26 Sup. Ct. 498, 50 L. Ed. 727. These cases are to the effect that, notwithstanding a grant to a state of public lands under a generic description, but dependent, as here, upon ascertainment and definition by survey or patent to pass the legal title, until such title is vested in the state the United States retains full and complete power to devote any portion of such lands to any necessary public purpose, leaving the state to be indemnified for the loss in such manner as Congress may have provided. These cases, it is true, have particular reference to the school land grants, but no good reason is perceived why a like principle should not apply to lands falling within the Swamp Land Act. If it be said that the school grants made provision for indemnity to the states by lieu selections for any lands lost through other disposition, it may be answered that Congress has, in the act of 1855 (10 Stats. at L. 634, c. 147), provided for the indemnity of purchasers and locators of swamp lands where the land is found to have been taken for other purposes. But whether this principle of indemnity would or would not apply to an instance where the United States has reserved the land for its own public purposes need not be considered, since the exercise of that power for an imperative use, such as military or naval purposes, cannot be made to depend upon that question.

These considerations, I think, render it unnecessary to notice the special defenses set up in the answer, since enough has been said to show that plaintiff's action cannot prevail.

Let judgment be entered in favor of the defendant, dismissing the action, and for his costs.