**KEWEENAW BAY INDIAN COMMUNITY, Plaintiff,**

v.

**STATE OF MICHIGAN, Defendant.**

**File No. M87–278–CA2.**

United States District Court, W.D. Michigan, N.D.

Feb. 28, 1991.

Bruce Richard Greene, Greene, Meyer & McElroy, P.C., Boulder, Colo., Joseph P. O'Leary, Baraga, Mich. and Garfield W. Hood, Circuit Judge, Twelfth Judicial Circuit Court, Houghton, Mich., for plaintiff.

John D. Walter, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Executive Div., and R. John Wernet, Jr., Asst. Atty. Gen., Lansing, Mich., for defendant.

## OPINION OF THE COURT

ROBERT HOLMES BELL, District Judge.

This is an action brought by plaintiff Keweenaw Bay Indian Community (hereinafter "the Tribe"), against defendant State of Michigan (hereinafter "the State"), seeking (1) a declaration regarding the boundaries of the L'Anse Federal Indian Reservation, established pursuant to an 1854 Treaty, and (2) an injunction restraining the State from improperly exercising civil and criminal jurisdiction within those boundaries.

The Keweenaw Bay Indian Reservation was established pursuant to Article 2 of the 1854 Treaty with the Chippewa, 10 Stat. 1109. That article provided, in pertinent part, that:

> *The United States agree to set apart and withhold from sale,* for the use of the Chippewas of Lake Superior, the following-described tracts of land, viz:
>
> 1st. For the L'Anse and Vieux De Sert bands, *all the unsold lands in the following townships* in the State of Michigan: Township fifty-one north range thirty-three west; township fifty-one north range thirty-two west; the east half of township fifty north range thirty-three west; the west half of township fifty north range thirty-two west, and all of township fifty-one north range thirty-one west, lying west of Huron Bay. (Emphasis added.)

The Tribe's complaint asserts that, based upon this language and upon the historical record surrounding the negotiation of the treaty, the boundary of its reservation was intended to follow the exterior lines of the townships and fractional townships described above, irrespective of land title within that area, and that, further, the reservation also includes a portion of the bed and waters of the Keweenaw Bay. The State's answer, on the other hand, contends that the reservation consists only

of those lands which had not been sold or otherwise disposed of by the United States prior to the effective date of the treaty and that, further, the reservation does not encompass the bed and waters of the Keweenaw Bay. The State's theory, accordingly, envisions a "checkerboard" reservation.

The record in this proceeding was fully developed during eight days of trial. The Court heard testimony from three expert historians presented by the parties, as well as from officials representing both the Tribe and the State. Over 300 exhibits were introduced, many of which were historical documents dating to the period leading up to and immediately following the negotiation of the 1854 Treaty.

At the close of the Tribe's case in chief, in response to the State's Motion for Directed Verdict, the Court ruled that title to and jurisdiction over the bed and waters of the Keweenaw Bay had passed to the State of Michigan, upon its admission to statehood, prior to the creation of the reservation. (V Tr. 636; Order dated January 4, 1989). The boundary of the reservation, accordingly, does not encompass the Bay. The remaining issue to be decided is whether the boundary of the reservation follows the exterior lines of townships and fractional townships described in the treaty, as is urged by the Tribe or whether the boundary must instead be drawn so as to exclude those lands that had been sold or otherwise disposed of by the United States prior to the effective date of the treaty, as is urged by the State.

For the reasons set forth below, the Court adopts the construction of the treaty urged by the Tribe and, accordingly, finds that the boundary of the Keweenaw Bay Indian Reservation follows the exterior lines of the townships and fractional townships described in the 1854 Treaty, irrespective of land title within those townships.

Any attempt to place this matter in its proper perspective necessitates a rather lengthy historical narrative of the events surrounding the treaty because, as this Court has concluded, an accurate historical account surrounding the making and implementation of the treaty gives meaning to the ambiguity in the critical treaty language.

### FINDINGS OF FACT

The Keweenaw Bay is located on the southern shore of Lake Superior in Michigan's Upper Peninsula. From the earliest records there existed a band of Lake Superior Chippewa Indians near the mouth of the Bay, on an east-west transportation corridor used by the Indians and later by fur traders. The Indians subsisted before the coming of European society, consistent with their traditional lifestyle, which included annual rounds of hunting and trapping in the Winter and fishing in the Spring, Summer and Fall. The Lake Superior Chippewas' lifestyle was first impacted by contact with the French, followed by the English and finally by the Americans. Euro–American contacts exposed the Chippewa, *inter alia*, to Christianity, a new kind of market economy, greed and avarice for their lands, intoxicants, disease, and a new style of dress and abode. These contacts, of course, did not supplant their culture.

In 1832, the American Fur Company licensed a trading post at Keweenaw Bay. The population in the area at that time consisted of 140 people, of whom 112 were Indian and 28 were Metis (part French and part Indian). Ex. P–6. The year 1833 brought Methodist missionaries to the east side of Keweenaw Bay and in 1842, Catholic missionaries to the west side of the Bay. These missions rather quickly built permanent churches, schools and houses for the Indians. The mission movement brought with it a "civilizing" of the Indians, whereby their clothes, behavior and vocations changed. I Tr. 99. Missionaries urged the Indians to dress like white men, decried the liquor trade of the fur traders, and promoted agricultural subsistence. This increased activity around the Bay resulted in larger numbers of Indians settling in the missions' vicinities, so that, by 1843, there were by census 337 persons living there, of whom 304 were Indians and 33 were mixed bloods or Metis. Ex. P–12; I Tr. 133.

The 1832 expedition of Henry Schoolcraft, followed by Douglas Houghton's famous exploration of the western Upper Peninsula, outlined the immense mineral reserves of the Western Range and the Keweenaw Peninsula, which were all held at that time by the Indians, pursuant to their unextinguished aboriginal title. Not surprisingly, these rich mineral deposits evoked considerable interest from land speculators, miners, and the federal government.

The United States Congress appropriated money on March 3, 1841, to defray expenses of entering into a treaty with the Chippewa for the extinguishment of their title within the State of Michigan where the mineral deposits were found. The Treaty with the Chippewa, 7 Stat. 591, was subsequently negotiated on October 4, 1842, under which the Indians conveyed to the United States their aboriginal title to the entire western half of Michigan's Upper Peninsula, including the Keweenaw Bay area, and to all of northern Wisconsin. Although Article III of the treaty provided for the eventual removal of the Indians to an area to the west occupied by the Mississippi Chippewa, it was thought that such removal would not take place for a considerable time in the future. Ex. P-7. In Article II, the Indians stipulated for the right to hunt in the ceded territory, together "with the other usual privileges of occupancy, until required to remove by the President of the United States...." Article VI provided that the Indians would be subject to removal from the mineral district at the pleasure of the President. It was contemplated that this limited removal from the mineral areas, if it occurred, would not move the Indians out of the remainder of their cession area. Article IV provided for the payment of annuities and the furnishing of goods and services to the Indians, including blacksmiths and carpenter shops, and schools. Notwithstanding the cession of title, the United States' laws with respect to trade and intercourse with non-Indians were to remain in effect in the ceded territory.

The events at Keweenaw Bay following the signing of the 1842 Treaty were significant. In accord with the treaty, farmers and blacksmiths were provided to the L'Anse band, along with funding to the mission boards in order to provide schools for the Indians. Although the treaty did not provide for land reservations, by all accounts the Indians were advised, and they so understood, that their lifestyle would be essentially unchanged after the treaty because the government only sought their minerals. Notwithstanding these assurances, the Indians, who did not want to remove, were very apprehensive about that potential. Of course, the threat of removal at that time seemed remote because the Indians were not living within the two important mineral districts in the area. The Indians' comfort was short-lived, however, due to the commencement of land surveying in 1845, which meant that legal descriptions could be made and land could be sold. To the Indians, land sales meant that their removal was likely and imminent.

On February 6, 1850, the President issued a removal order, pursuant to the 1842 Treaty. I Tr. 159. However, that order was subsequently withdrawn in August, 1851, and the Indians were never actually required to remove. II Tr. 164. Nevertheless, according to Henry C. Gilbert, the Michigan Indian agent who negotiated the subsequent 1854 treaty, removal was "the great terror of their [the Indians'] lives and I hazard nothing in saying they will sooner submit to extermination than comply with it." Ex. P-25; II Tr. 166.

The survey of the Upper Peninsula area around Keweenaw Bay was completed in 1848. Some land purchases began to occur on both sides of the Bay at about that time. Numerous urgent letters and petitions from Indians and their representatives to Indian agents and the President evidenced concern about removal and revealed a desire to purchase land around the Bay by and for the benefit of the Indians. Father Baraga, a renowned Catholic missionary, purchased land on the west side of the Bay upon which he located a church, school and approximately 30 homes occupied by Indians. He even purchased a parcel adjacent to the Indian community which had been

patented to a non-Indian when Baraga believed the interests of the non-Indian were antithetical to the Chippewa community. Some Indians also pooled their money from annuities received under the 1842 Treaty and purchased land through one of their own, or through non-Indians who purchased land on their behalf. Many Indians in the Keweenaw Bay area adopted American-style (or non-Indian) names, clothing, houses, and other customs. Some swore allegiance to the United States before a magistrate. These accommodations to American culture were often intended to demonstrate the Indians' advanced degree of "civilization". It was hoped by some that such accommodations would convince the government to grant them citizenship and permit them to remain in their homes rather than force them to remove to the west. Ex. D–71; VI Tr. 792; VII Tr. 906–907. A consistent Indian theme throughout the period of removal and prior to the 1854 Treaty was an ardent desire for permanent homes for the Indians in their present locations.

By the early 1850's, the population at Keweenaw Bay had grown to about 640 Indians, which continued to represent more than 80% of the total population in the area. The increase in population at the Bay was due primarily to the Catholic and Methodist missions. Generally, about one-third of the Indians were associated in one way or another with the two missions.

The evidence indicates that in the 1840's, the federal government's policy towards Indians, known as "removal," was being abandoned. Removal was characterized by the movement of tribes from the eastern portion of the United States to lands to the west, out of the path of western settlement by non-Indians. The removal policy became antiquated as the settlement patterns of non-Indians moved inexorably westward. It became clear in the 1840's that there was rapidly becoming no place to move the Indians. II Tr. 184–5. The benevolent rationale for the removal was to isolate the Indians from the adverse impacts resulting from their contacts with non-Indian society. Of course, the primary motivation was to free Indian lands from their claims to them

so the lands could be settled by non-Indians.

This same rationale underlay the creation of the reservation system, which replaced the removal policy. II Tr. 186. The separatism that was hoped for could no longer be achieved through removal. However, Commissioner George W. Manypenny believed that the civilization policy could be achieved through the reservation system. Thus, he believed that if the Indians were temporarily isolated on discrete parcels, away from the deleterious influence of non-Indians, they could gradually become assimilated or "civilized" and eventually could be incorporated completely into non-Indian society. VII Tr. 1022. The reservation concept as a "way-station" was a necessary step, then, in the civilization process. VII Tr. 967.

The rationale for the evolving reservation policy is set forth in a series of annual reports of the Commissioner of Indian Affairs and correspondence between the Commissioner and Michigan Indian agents. See, Exs. P–82, P–83, P–84, P–85, P–86 and II Tr. 223–25, 237–39. The purport of that material is that, as stated, removal was no longer feasible with the advancement of white settlement. The new policy of the government was to provide "permanent homes" on the reservations that were set aside for the Indians and upon which trespass by non-Indians would not be tolerated. Additionally, there were three evils attendant to the government's policy in the past, which Manypenny sought to avoid in the future: first, the payment to the Indians of excessive annuities, which promoted profligacy and the consumption of intoxicants; second, excessive quantities of land held in common; and third, continued changes in location in advance of the western movement of settlers. The 1854 Treaty, as well as others negotiated during this period, were intended to address these articulated evils.

Correspondence from Commissioner Manypenny to the Indian agents about to undertake treaty negotiations with the Lake Superior Chippewa in the early 1850's is critical to an understanding of the

government's intentions. One of the four letters of instruction from Commissioner Manypenny to Henry C. Gilbert provides:

I send herewith a copy of the instructions of the Secretary of War of the date of 4th June of 1847 when a former commissioner attempted to treat with these indians but failed. According to the estimates of this office, the Chippewa own about 10,743,000 acres of land, the greater part of which is of no value to them, and never will be. Some portions of it will be valueless to the white population.

Nevertheless, the condition of affairs with the Chippewas is such that it is the duty of the Government to offer them an opportunity to dispose of their tenure to their Country, and in lieu thereof, to give them a small tract as a permanent home, with such means of support & mental & moral improvement as may be of great advantage to them.

Ex. P–27. Manypenny was explicit in his directions regarding the nature of the reservations to be created under the 1854 Treaty:

I propose the following arrangements for the Chippewas—1. To set apart certain tracts of public lands in Michigan in locations suitable for the Indians & as far removed from white settlements as possible & within which every Indian family shall be permitted to enter without charge & to own & to occupy eighty acres of land. The title should be vested in the head of the family & the power to alienated (sic) should be withheld. All the land embraced within the tract set apart should be withdrawn from sale & no white persons should be permitted to locate or live among them, except teachers, traders & mechanics specially authorized by rules & regulations to be prescribed by the State Government. It may also be safely left to the same authority to terminate the restriction of the power to alienate their lands whenever deemed expedient & at the same time the unappropriated lands in the tracts withdrawn from sale should be again subject to Entry.

P–26. While one large reservation for all the Lake Superior Chippewa was preferred over several smaller reservations, Manypenny quickly realized that goal was unattainable. Ex. P–28. There was great mistrust and enmity between the Chippewa of the Upper Mississippi and Lake Superior. Also, the bands were scattered over a vast geographic area. Ultimately, the 1854 Treaty provided for six different reservations in locations throughout the 1842 Treaty area of cession.

Henry C. Gilbert was the principal government negotiator for the 1854 Treaty signed near LaPointe, Wisconsin. Representing the L'Anse band of Chippewa were several Indians, most notably Peter Marksman, Chief David King, and Headman John Southwind. All three were attached to the Methodist mission on the east side of the Bay. Marksman, who had become a Methodist minister and a missionary to his own people, had learned English while studying for 14 months at a seminary in Illinois. II Tr. 207; V Tr. 754–757. King and Southwind apparently knew some English, most likely acquired through the efforts of Keweenaw Bay's Methodist mission which conducted its services and instruction in the English language. II Tr. 207; V Tr. 759; Ex. D–12. The other Indian signers of the treaty were probably not literate and learned about the meaning of the treaty through interpreters. II Tr. 207.

Article 1 described the area of cession, located to the west of Lake Superior, which were lands the United States considered to be held in-common by the Lake Superior and Mississippi Chippewa. Article 2, the relevant portions of which are quoted above, described the reservations created for the Indians. The lands reserved at Keweenaw Bay were to consist of all the "unsold lands" in certain specified townships and fractional townships. In contrast, the tracts reserved for the other bands of Lake Superior Chippewas were described merely by metes and bounds or by references to topographical features. Little was known about the interior of northern Wisconsin. Thus, in the case of two bands, even a metes and bounds description was not possible. Only at L'Anse, where the land had already been surveyed

and the section and quarter sections previously marked, was it possible to use the township lines to describe the boundary of the reservation.

Because, with the exception of the reservation at L'Anse, the boundaries of the remaining reservations could not be accurately described, Article 3 of the treaty provided that:

> The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents thereafter to such occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations, respecting the disposition of the lands in case of the death of the head of a family, or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise, as shall be necessary to prevent interference with any vested rights. All necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases.

A provision permitting certain non-Indian preemption, while not directly pertinent to the L'Anse bands, evinces an understanding by all parties to the treaty that, within the reserved tracts, were parcels already occupied by non-Indians, some of whom had made improvements to the land prior to the treaty. That provision is set forth in Article 10:

> All missionaries, and teachers, and other persons of full age, residing in the territory hereby ceded, or upon any of the reservations hereby made by authority of law, shall be allowed to enter the land occupied by them at the minimum price whenever the surveys shall be completed to the amount of one quarter-section each.

It is significant that there is no suggestion in the historic record that such preemption lands were to be excluded from the reservations, even though title to these lands would clearly be held by non-Indians under the provisions of Article 10. In this respect, preemption lands and "sold" lands (i.e., lands sold by the United States prior to the treaty) are substantially similar, with the principal difference being that preemption lands were not patented until after the treaty was concluded. Both classes of lands, however, consisted of parcels which, although owned by non-Indians, were plainly to be located within the reservation boundary.

What can be concluded about the "sold" or patented lands at the time the treaty was negotiated? Considerable trial testimony documented literally every land transaction preceding the Treaty of 1854. Further review of map exhibits prepared from these transactions is most revealing. As of September 30, 1854, many of the shoreline lands within the reservation townships had been sold or patented. Specifically, most of the Indian residences were situated on patented land. It defies common sense to conclude that Indians would seek a treaty to create a permanent home for themselves and exclude the Indian villages and the property upon which many of their own residences were located.

■ The Court fully appreciates its obligation to construe the treaty as the Indians would have understood it. The canons of treaty construction so require. They also require that ambiguities in treaty language be resolved in favor of the Indians. *Jones v. Mehan*, 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1989); *Winters v. United States*, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). "How the words of the

Treaty were understood by [the Indians], rather than their critical meaning, should form the rule of construction." *Worchester v. Georgia*, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832). Thus, the State's contention that the Court must focus on only two words in the treaty—"unsold lands"—and construe those words to exclude the Indian villages and many other parcels of land from the reservation, would be to ignore the Indians' understanding of what they were receiving by way of a reservation under the treaty. Furthermore, it would interpret the words "unsold lands" in a critical matter "according to the technical meaning of ... [those] words to learned lawyers" (*Jones v. Mehan, supra*, 175 U.S. at 11, 20 S.Ct. at 5), which the canons specifically preclude. It must be remembered, it was the treaty commissioners, not the Indians, who chose the words of the treaty. To draft the document in the treaty commissioners' language and subsequently construe the language in a technical manner, contrary to the Indians' interest, would not only flaunt the canons, but would be flatly inconsistent with the government's fiduciary duties.

■ When the treaty is viewed from the Indians' perspective, it is clear they understood that their reservation was to consist of a bounded tract of land approximately three townships in size. The fact that there were some parcels of patented lands held by missionaries, teachers, government workers, Indians in their own names, and even some few non-Indians, did not mean that the Indians would have understood their reservation as encompassing something less than the townships specified in the treaty. After all, most of the non-Indian landowners were there in support of the Chippewa community. Indeed, most of the patented lands known by the Indians to have been sold prior to the treaty were lands held, as a practical matter, for the Indians' benefit.

It is estimated that the three plus townships involved in the treaty contained approximately 60,000 acres, of which approximately 2,600 acres were patented by the government, or "sold" at the time of the treaty. If from that amount is deducted all the land either owned directly by Indians or held by white men for Indians, the remaining amount is only seven parcels of approximately 970 acres, or about 1.6% of the reservation area. A careful review of those seven parcels by ownership discloses that six of the non-Indian owners probably did not reside on the land involved. They were, most likely, land speculators. Only one, Oscar Foote, was clearly shown to have resided on his land, a 127 acre parcel south of the Catholic mission land on the west side of Keweenaw Bay. Thus, from the Indians' perspective, they would have been "on notice" of but one unaffiliated white landholder within the townships which formed their reservation. Conversely, Oscar Foote would have been "on notice" when procuring his land patent that he was choosing to take up residence in aboriginal Indian territory adjacent to a Chippewa Indian community.

After the treaty was ratified and proclaimed, all correspondence relating to the L'Anse band indicated they were to continue to reside along the shore of Lake Superior on both sides of Keweenaw Bay, near the Methodist and Catholic missions. Commissioner Manypenny's annual reports to Congress mention this band in conjunction with other bands which were the subject of contemporaneous treaties wherein reservations were created to promote "civilization" by providing property rights for Indians exclusively within confined boundaries. Concern was repeatedly expressed that during this early formative period for reservations, white men should not be permitted to intrude upon reservation lands set aside for the Indians.

Considerable trial proofs concerned the matter of so-called school and canal lands, and swamplands. Those terms refer to lands which were said to have passed to the State prior to the treaty by means of federal grants made under various Acts of Congress. The Court finds, however, that these grants are not legally significant to the question before this Court. This case raises only the question of the location of the exterior boundary of the L'Anse Federal Indian Reservation, as established by the

1854 treaty. That question is addressed by determining the Indians' understanding of the treaty, consistent with the canons of treaty construction. If there are two plausible interpretations of the treaty, the Court is obligated as a matter of law to choose the one consistent with the Indians' understanding. Discerning the Indians' understanding of the treaty with regard to the location of the reservations's boundary can be accomplished without addressing any questions relating to title. The record is devoid of any evidence demonstrating that, at the time of the treaty, either the Indians or the treaty commissioners had any knowledge whatsoever of canal, school and swamplands. These lands appear, moreover, to have been entirely undeveloped and unoccupied at the time of the treaty. Consequently, it is inconceivable that the Indians would have understood these lands, some of which were immediately adjacent to the missions and the Indian village, to be outside the reservation boundary.

It appears from all the evidence presented that the L'Anse band of Chippewa Indians understood that the Treaty of 1854 established a reservation, the boundaries of which were coterminous with those of the townships and fractional townships described in the treaties. The words "unsold lands" in the treaty provision establishing the reservation referred only to land title, and had no bearing upon the question of boundary. The significance of this language, as it was understood by the Indians, was merely that some parcels within the reservation had already been disposed of by the United States and would, therefore, not be available for allotment to the Indians. This same process was due to occur at the other reservations, pursuant to the provision for preemption, albeit after the treaty was concluded. The "unsold lands" language, consequently, was not understood by the Indians as having any impact whatsoever on the reservation boundary. However, that is far different from the State's contention that somehow these "sold" parcels were not part of the reservation set aside for the Indians. It is clear to the Court, and it so finds, that all of these lands are within the boundary of the reservation, irrespective of whether they had been sold by the United States prior to the effective date of the 1854 treaty.

Thus, based upon the historical record in this case, it is clear to the Court, and the Court so finds, that the boundary of the reservation was intended by the United States, and was understood by the Indians, to follow the exterior lines of the townships and fractional townships described in Article 2 of the treaty. To construe the treaty in any other manner would necessarily result in a finding that the parties intended to participate in the creation of a "checkerboard" reservation, a result clearly *not* intended by anyone signing the treaty.

This conclusion is supported by the efforts of the United States, in the years immediately following the treaty, to require for the benefit of the Indians a number of the parcels sold prior to the treaty. Lands titled to P. Barbeau, B.F. Rathbun, and F. Baraga, which had originally been acquired by these missionaries for the benefit of the Indians, were repurchased by the United States for the Indians. Documentary evidence disclosed that, pursuant to the treaty, the government reimbursed those persons for these lands, thereby permitting the Indians to take such parcels as part of their individual allotments.

Considerable correspondence from Indian signatories to the treaty for the next several decades also supports this conclusion. Repeatedly, the Indians stressed their understanding that the *whole* reservation was thought to be set aside for Indian use. A letter from Chief David King of January 7, 1865, to the Indian Commissioner recites the Indians' understanding at the time the treaty was made that the government reserved the land for them and prohibited white men and "half breeds" living on the reservation and cutting timber within the boundary. Particular agitation appears from King's assertion that some white men claim the Indian reservation land claim is "no good." Ex. P–43. The Commissioner agreed with King and wrote the Secretary that half-breed selections should be confined to the ceded territory and not on the

reservation because the reservation had been reserved for the Indians. Ex. P–45, II Tr. 253–54.

The State of Michigan's position concerning what land was intended for the Indians is rather straightforward and is urged to be the plain reading of the treaty—namely, that the federal government gave to the Indians only those lands which were "unsold" and, consequently, the reservation could consist of only those "unsold" lands. The issue of boundary, the State urges, was not one which was of concern to the parties because they viewed the reservation as being merely temporary in nature, to be eventually dissolved when all of the land had been allotted and the Indians had been fully assimilated into non-Indian culture and society. In support of this position, the State points to documentation establishing that, during the 1850's, federal policy makers viewed reservations as temporary "way-stations" leading to the eventual integration of civilized Indians into American culture through assimilation and detribalization. Until that time occurred, the protections afforded by restrictive deeds, annuities, government sponsored schools, blacksmiths and farmers were intended to isolate Indians so that assimilation could proceed at an appropriate pace without the interferences associated with non-Indian society. Thus, the treaty becomes a form of self-executing land distribution. When the land was fully allotted, the treaty was executed, according to the State. Hence, the question of well-defined jurisdictional boundaries, the State urges, was not one which was of concern to any of the parties to the treaty.

The Court finds such an interpretation too narrow a reading of the treaty and one not intended by either party. The treaty dealt with a group of identifiable Indians and gave them a limited reservation where it was intended the group would reside permanently. *See* Ex. P–86, pp 289–90. The report to the Senate by the Secretary of Interior on November 30, 1860, describes all the types of Indian reservations created during that period as follows:

Again, the treaty of annuity Indians may be arranged in two divisions. With one we have treaties of amity, and we pay them annuities, either in money, goods or provisions, or perhaps all three, for a longer or shorter period, but without recognizing their title to any particular tract of country. We not only pay annuities to the other, but we recognize their title to particular tracts of country, described by metes and bounds, and guaranty them undisturbed possession of the same forever. This latter class, again, must be subdivided whether in fee, or by the usual Indian title, and those whose lands are held in severalty by the individual members of the tribe. There is yet a further distinction to be made between those cases *where several reservations are in a compact body, surrounded by a well-defined exterior boundary, constituting them a tribal reservation* over which the intercourse laws can be enforced, and those in which the individual reservations are scattered among the white settlements, and subjected to the operation of the laws of the State of Territory in which they are situated. (Emphasis added.)

Which of these descriptions best characterizes the L'Anse band of Chippewa in 1860? Of course, the compact body of land surrounded by a well-defined exterior boundary. Thus, the government, for the decades following the treaty, treated the Indians as a group whose bounded reservation was to be protected from intrusion and dealt with as a tribal unit.

■ While Indian Commissioner Manypenny's reservation policy of the 1850's envisioned a gradual Indian assimilation into American culture, does this mean that at some point the executory treaty was fulfilled and the reservation ceased to exist? No evidence suggests the L'Anse Indian community, or its reservation, ever ceased to exist. The Supreme Court in *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), has recognized that the presence of allotment provisions in a treaty does not mean the reservation is terminated as a matter of law when allotment takes place. Further, a clear and unambiguous legislative act is required to

terminate a reservation of land created by treaty or statute. *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909). This treaty did not contain within it a termination clause. In addition, on two occasions, the Supreme Court referred to the 1854 treaty as creating "permanent" reservations. *Wisconsin v. Hitchcock*, 201 U.S. 202, 26 S.Ct. 498, 50 L.Ed. 727 (1906), and *United States v. Thomas*, 151 U.S. 577, 14 S.Ct. 426, 38 L.Ed. 276 (1894).

■ During the period around 1900, considerable documentation concerning the L'Anse Indians' assertion of hunting and fishing rights suggests a rather restrictive jurisdictional interpretation by the federal government, a position in which the State apparently concurred. Indian land title appears to have been linked both to treaty rights and to jurisdiction generally. This interpretation was found to be incorrect with respect to fishing rights in *United States v. Michigan*, 471 F.Supp. 192 (W.D.Mich., 1979), *aff'd.*, 653 F.2d 277 (6th Cir.); *cert. denied*, 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). Similarly, the link between Indian land title and jurisdiction was effectively severed in 1948 when Congress enacted the modern day definition of "Indian country" in 18 U.S.C. § 1151. *See, Solem v. Bartlett*, 465 U.S. 463, 468, 104 S.Ct. 1161, 1164, 79 L.Ed.2d 443 (1984). Accordingly, the manner in which the federal and state governments previously defined tribal jurisdiction, or "Indian country" as a matter of executive opinion is of little persuasive authority to this Court's required interpretation of "Indian country" as it exists today pursuant to 18 U.S.C. § 1151.

### CONCLUSIONS OF LAW

What is "Indian country" within the intended meaning of 18 U.S.C. § 1151 is the gravamen of the jurisdictional issue before this Court. That term is presently defined as:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

In the foregoing findings, it was concluded that the reservation boundary created by the Treaty in 1854 was coterminous with the boundaries of the townships and fractional townships described in the treaty. That same boundary has existed continuously since then. It follows that "Indian country," for jurisdiction purposes, pursuant to 18 U.S.C. § 1151, must consist of all of the land "within the limits of" these boundaries.

This Court's conclusion comes as a surprise to no one living in the vicinity of L'Anse, Baraga and the Keweenaw Bay. Since earliest times, it has been an uninterrupted residential community of Chippewa Indians whose identity has been well-known and frequently asserted. To engage in a twentieth century search of all land titles to determine which tracts have been continuously owned by Indians, or have been subsequently reacquired by Indians, is to lose sight of the distinction between jurisdiction and title. It does the public a great disservice to require law enforcement officers to consult elaborate maps describing the precise "checkerboard" to be able to effectuate lawful arrests. This resultant confusion frustrates the community and enables lawless individuals to evade responsibility under the criminal justice system. This was neither the government's nor the Indians' intentions when making the treaty, nor the intent of Congress when enacting 18 U.S.C. § 1151.

Counsel for plaintiff Tribe shall prepare an Order in conformity with this Opinion for approval of defendant's counsel and signature of this Court.